UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| ALL FUNDS ON DEPOSIT HELD IN | § | CIVIL NO. |
| SEVEN J.P. MORGAN CHASE BANK | § | |
| ACCOUNTS AND SEVEN MIDFIRST | § | |
| BANK ACCOUNTS, | § | |
| AND THREE REAL PROPERTIES; | § | |
| Defendants. | § | |

## VERIFIED COMPLAINT FOR CIVIL FORFEITURE
## IN REM AND NOTICE TO POTENTIAL CLAIMANTS

Now comes Plaintiff, the United States of America, and files this action for forfeiture *in rem* against the above-entitled Defendant Properties. The United States respectfully alleges on information and belief as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.  The Defendant Properties are located in the Southern District of Texas or are forfeitable due to acts and omissions occurring within the Southern District of Texas and are therefore within the jurisdiction of this Court.

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1355, 1391(b) and 1395(a) and (b).

### THE DEFENDANT PROPERTIES SUBJECT TO FORFEITURE

3.      The Defendant Properties are described as follows:

a.   $270,813.35 in JPMC account 2871

b.   $872,248.65 in JPMC account 0473

     c.   All funds in JPMC account 0292

     d.   All funds in JPMC account 1769

     e.   All funds in JPMC account 2922

     f.   All funds in JPMC account 6187

     g.   All funds in JPMC account 9211

     h.   $124,940.18 in Midfirst account 0172

     i.   $100,865.34 in Midfirst account 0180

     j.   $60,332.23 in Midfirst account 0390

     k.   $2,807,704.49 in Midfirst account 0412

     l.   $10,000.00 in Midfirst account 0420

     m.   $196,892.65 in Midfirst account 0900

     n.   $122,863.65 in Midfirst account 5799

     o.   6418 Anthonia Lane, Richmond, TX

     p.   4525 Avenida Monterrey, Richmond, TX

     q.   21350 FM 529 Road, Cypress, TX

(the "Defendant Properties").

## BASIS FOR FORFEITURE

4.      Title 18 U.S.C. § 981(a)(1)(C) and § 982(a)(7) states that property "that constitutes or is derived . . . from proceeds traceable to the commission of the offense[s]" of wire fraud and health care fraud is subject to forfeiture.

5.      Title 18 U.S.C. § 1956 (a)(1)(A)(i) states: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct a financial transaction which in fact involves the

proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity" is guilty of a violation of 18 U.S.C. § 1956(a)(1)(A)(i).

6.        Title 18, United States Code, Section 1956 (a)(1)(B)(I) states: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of a violation of 18 U.S.C. § 1956(a)(1)(A)(i).

7.        Title 18, United States Code, Section 1957 provides that: "whoever… knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity…" is guilty of a violation of 18 U.S.C. § 1957.

8.        Title 18, United States Code, Section 982(a)(1) authorizes the criminal forfeiture of "any property, real or personal, involved in [a violation of 18 U.S.C. §§ 1956, 1957, or 1960], or any property traceable to such property."

9.        Title 18, United States Code, Section 981(a)(1)(A) states: "The following property is subject to forfeiture to the United States: (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of this title, or any property traceable to such property."

10.       Title 18, United States Code, Section 984 provides that "it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture" and "it shall not be a defense that the property involved in such an offense

has been removed and replaced by identical property" so long as the action to forfeit the property is commenced within one year of the date of the offense.

11.     Furthermore, if a business or criminal enterprise is permeated by fraud, the government is not required to trace the fraudulent funds dollar-to-dollar in order to prove forfeitability. It is no defense to forfeiture that some legitimate funds were generated if the overwhelming balance of the funds sought for forfeiture are illegal proceeds or property involved in money laundering.

## BACKGROUND

12.     United Palliative & Hospice Care, Inc. ("UPHC) is a hospice company owned and operated by Dera Ogudo ("Ogudo"). An investigation conducted by U.S. Department of Health and Human Services agents revealed that UPHC is billing Medicare for hospice services without regard for medical necessity. Investigators interviewed dozens of UPHC patients who were on hospice services for several months to years yet were never terminally ill as required by Medicare, and/or were not aware that they were enrolled in hospice services with UPHC. The investigation revealed that many of UPHC's patients are vulnerable adults living in Houston-area group homes or assisted living facilities. The investigation has uncovered that Ogudo and UPHC are making regular payments to several of these group home owners or managers through UPHC's payroll, via check, or other methods of payment. The investigation determined that these payments from UPHC to the group owners or managers were in exchange for allowing UPHC to bill Medicare for hospices services for the residents in their group homes and therefore illegal healthcare kickbacks.

## FACTS OF THE CASE

13.　　　　Beginning in or around July 2019, and continuing until approximately the present, Dera Ogudo ("Ogudo") along with family members and associates initiated a fraudulent scheme wherein Ogudo operated a business enterprise under the guise of providing hospice services for persons purported to be dying and recruited patients solely for the purpose of enrolling these individuals in hospice services without regard to whether the individuals actually qualified for, or required, end-of-life care.  Ogudo then billed Medicare and Medicaid for hospice services on behalf of the patients under the business name of United Palliative & Hospice Care, Inc. ("UPHC"), which placed these patients on hospice care and deprived many of these patients access to medical treatments and/or other medical procedures that they would have otherwise been entitled to under Medicare, since hospice services are strictly end of life care and not medical treatment.

14.　　　　Ogudo opened numerous financial accounts in the business name at various financial institutions in which she was listed as the only signor, along with personal bank accounts to receive and disperse the fraudulent funds which included paying kickbacks to family members and associates involved in operating the group homes and the "recruitment" of beneficiaries in furtherance of the fraud scheme.  From its inception, Ogudo and her associates actively "marketed" seniors and vulnerable individuals assigned to group homes to register them for hospice services through UPHC regardless of whether these people were aware or not that UPHC was going to use their names and identifying information to bill in their names for hospice services.   In furtherance of the fraud scheme, Ogudo and her associates did not consider if the individual required hospice services or if they were even terminally ill, which in and of itself does not always warrant hospice services

since hospice care should be end of life care and not even for a terminally ill condition that may last for years qualifies.

15.        In addition, Ogudo and her associates did not consider (or did not care) that by enrolling these beneficiaries in hospice care that these beneficiaries would no longer be eligible for curative care like medical treatments that would potentially lead to a recovery since hospice services solely represent end-of life care.  Ogudo and her associates frequently deceived prospective beneficiaries by advising them that UPHC would be providing home health care services and/or transportation services, when in fact the purpose of enrolling these individuals was for UPHC to begin billing Medicare/Medicaid for hospice services for them.

16.        Ogudo received millions of dollars in ill-gotten gains. She used these proceeds for personal gain and for sharing with a number of associates, including family members, who aided her in furthering the fraudulent scheme, all of whom were also well compensated. Since Ogudo started receiving the fraudulent Medicare/Medicaid funds in late 2019, Ogudo paid herself over $3.5 million in "salary".  Ogudo also spent over $8.7 million for the purchase of a multi-million-dollar commercial property, the purchase of a residential property, and the construction of two luxury residences.

17.        The substantial majority of funds generated by UPHC are 1) illegal proceeds of the kickback scheme undertaken by Ogudo and others; 2) illegal proceeds generated by falsely enrolling ineligible patients in hospice or palliative services; or 3) both. UPHC was permeated by the fraud and kickback scheme; but for these illegal proceeds, it is unlikely that UPHC would have been able to operate.

## STATUTORY FRAMEWORK GOVERNING MEDICARE AND MEDICAID

### The Medicare Program

18.          The Medicare program ("Medicare") is a federally funded health care benefit program as defined in Title 18, United States Code, Section 24(b). Medicare is designed to provide medical services and items to individuals over the age of 65 and certain others with recognized disabilities. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

19.          The Medicare payment system is comprised of four parts:

> i.   Medicare Part A, which provides, among other things, hospice, hospital, long-term care, and home health coverage;
>
> ii.  Medicare Part B, which provides coverage for outpatient services and durable medical equipment;
>
> iii. Medicare Part C, which provides managed care coverage; and
>
> iv.  Medicare Part D, which covers prescription drug benefits.

20.          To enroll in Medicare, all health care providers are required to submit a Medicare enrollment application. In submitting the Medicare application, health care providers certify that they understand and will abide by the federal laws and regulations governing their participation in Medicare.

21.          The CMS-855A is the provider enrollment application. It contains a certification statement signed by the authorized official that states, "My signature legally and financially binds this provider to the law, regulations, and program instructions of the Medicare Program." Further, the CMS-855A states, "I agree to abide by the Medicare laws,

regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

22.       When Medicare approves a provider's application, Medicare issues the provider a unique provider number. Medicare uses the unique provider number to identify the provider in claims submitted for payment CMS contracts with Palmetto Government Benefit Administrators ("Palmetto GBA "), to perform all of the enrollment activities for hospice providers in the State of Texas.

23.       Upon enrollment, Medicare issues providers a provider manual that describes the requirements to participate in the Medicare program as well as newsletters advising them of any additional requirements for participation and instructions on what services Medicare covers.

24.       CMS has contracted with Palmetto GBA to administer Medicare Part A claims in the State of Texas which include claims for hospice services. Each time a provider submits a claim to Medicare, the provider certifies that the claim is true, correct, and complete, and complies with all Medicare laws and regulations. The claims are generally submitted electronically.

25.       Individuals who qualify for Medicare benefits are commonly referred to as Medicare beneficiaries. Each beneficiary is assigned a Health Insurance Claim Number ("HICN").

26.        Medicare and Medicaid are federal health care benefit programs as defined by Title 18 of the United States Code. This investigation concerns claims for Medicare Part A claims.

27.        A provider enrolled as a Medicare provider is able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim is required to set forth, among other things, the beneficiary's name and Medicare HICN, the services that were performed for the beneficiary, the date the services were provided, the cost of the services and the name and identification number of the physician or other health care provider who ordered the services.

28.        Medicare pays claims on an honor-based system, meaning Medicare pays the claims assuming the claims filed by providers are honestly submitted and wholly accurate. Providers submit the claims electronically without any medical records submitted. However, Medicare requires providers to maintain all records to substantiate the claims upon the request of Medicare or health care oversight agencies for at least 5 years.

## The Medicaid Program

29.        The Medicaid Program ("Medicaid") is a state-administered health insurance program funded by the United States Government and by the State of Texas.  Medicaid helps pay for reasonable and necessary medical procedures and services provided by qualified healthcare professionals to individuals who were deemed eligible under state low-income programs.  Medicaid was implemented in 1967 under the provisions of the Social Security Act of 1965.  Individuals receiving benefits under Medicaid are referred to as Medicaid "clients".   The Texas Health and Human Services Commission ("HHSC")

administers Medicaid in Texas. Medicaid is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

30.         In order participate in the Medicaid program, a provider must submit an application to the Texas Medicaid and Healthcare Partnership ("TMHP"). If the provider meets certain qualifications, TMHP will approve the application, enter into a written contract with the provider, and issue a unique provider identification number to the provider. TMHP-enrolled providers could contract with MCOs to provide medical services to Medicaid clients.  The provider is then allowed to submit bills for services, known as "claims," to Medicaid or MCOs for reimbursement for the cost of providing medically necessary services to Medicaid clients.

31.         By entering into a contract with Medicaid, a provider agrees to abide by the policies and procedures of the Medicaid program. Medicaid regulations require that a provider document every service rendered to a beneficiary for whom a claim is submitted. This documentation is part of the beneficiary's medical record and is required to be retained by the provider for a period of not less than five years.

### Hospice Care

32.         Medicare covers hospice care when all of the following criteria are met:

   i.   The Medicare beneficiary is eligible for Medicare Part A;

   ii.  The beneficiary is certified as having a terminal illness with a medical prognosis of six months or less if the illness runs its normal course;

   iii. The patient receives care from a Medicare-approved hospice program;

   iv.  The patient signs a statement indicating that he or she elects to accept palliative care instead of care to cure their illness (curative care); and

v.  The patient signs a statement choosing hospice care instead of other Medicare covered treatments for the terminal illness and related conditions.

33.       However, if the beneficiary lives beyond six months, the beneficiary is still eligible to receive hospice care if the hospice medical director or other hospice doctor recertifies the beneficiary as terminally ill.  The beneficiary is given two ninety-day periods, followed by an unlimited number of sixty-day benefit periods. At the start of the first ninety (90) day benefit period extension, a hospice doctor and a regular doctor or nurse practitioner certifies the beneficiary is terminally ill with a life expectancy of six (6) months.  At the start of each benefit period after the first ninety (90) day period, the hospice medical director or other hospice doctor must recertify that the beneficiary is terminally ill if they are to continue receiving hospice care.

34.       Medicaid hospice coverage follows the amount, duration, and scope of services specified in the Medicare Hospice Program. A beneficiary that is dually Medicare and Medicaid eligible must elect hospice care under both Medicare and Medicaid.

35.       Section 1861(dd) of the Social Security Act defines "hospice care" as certain items and services provided to a terminally ill individual by a hospice program under a written plan established and periodically reviewed by the individual's attending physician and by the medical director of the hospice program. The services may include doctor and nursing care, certain medical equipment and supplies, certain drugs for pain or symptoms, home health aide services, therapy, social work and counseling, and short-term inpatient stays. Medicare will not pay for treatment to cure the terminal illness under the hospice benefit. Rather, hospice uses medicine, equipment, and supplies to make a patient as comfortable and pain-free as possible.

36.     When a hospice admits a patient into hospice service under a Medicare-approved hospice entity, the admitting physician or Medical Director must certify the patient meets the criteria as set forth by Medicare.

> i. Specifically, they must sign a "Certification of Terminal Illness" certifying the patient is terminally ill and the terminal illness is most likely to result in death of the patient within 6 months if the illness runs its normal course.

37.     For the first 90-day period of hospice coverage, the hospice must obtain, no later than 2 calendar days after hospice care is initiated (that is, by the end of the third day), oral or written certification of the terminal illness by the medical director of the hospice or the physician member of the hospice interdisciplinary group ("IDG") and the individual's attending physician if the individual has an attending physician. No one other than a medical doctor or doctor of osteopathy can certify or re-certify an individual as terminally ill, meaning that the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course. Nurse practitioners and physician assistants cannot certify or re-certify an individual as terminally ill. In the event that a beneficiary's attending physician is a nurse practitioner or a physician assistant, the hospice medical director or the physician member of the hospice IDG certifies the individual as terminally ill. The hospice must obtain written certification of terminal illness for each benefit period, even if a single election continues in effect. A written certification must be on file in the hospice patient's record prior to submission of a claim to the Medicare contractor. Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written

certification. Initially, the clinical information may be provided verbally, and must be documented in the medical record and included as part of the hospice's eligibility assessment.

38.     The "Certification of Terminal Illness" is a statement relied upon by Medicare to ensure the patient is eligible and thus covered for the hospice service. Medicare pays the hospice claims billed by a hospice assuming the statement is accurate.

39.     Hospice facilities provide different levels of care depending on the needs of the patient and the eligibility of the patient for that level of care. The hospice facility then submits claims to Medicare based on the level of care provided. Hospice claims are billed to Medicare Part A on a per diem basis depending on the eligibility of the patient. The per diem claims fall under four different categories:

  i.  Routine Home Care ("RHC") is provided in the home or alternate living facility such as a nursing home or assisted living facility but is not Continuous Home Care.

  ii.  Inpatient Respite Care ("IRC") is provided by an approved facility on a short-term basis, usually no more than 5 days, to provide family caregivers a "respite" or break. Respite care was billed at a per diem rate of approximately $167.45 in 2016.

  iii.  General Inpatient ("GIP") care is provided in an inpatient facility for pain control or acute or chronic symptom management which cannot be managed in any other setting. The per diem rate for GIP was approximately $720.11 in 2016.

    iv.  Continuous Home Care ("CHC") is the highest level of billing and is provided in the home, not in an inpatient setting, consisting predominately of nursing care on a continuous basis at home.

40.       Hospice entities can provide services in various locations. If the hospice service is provided in the patient's home, nursing home, or assisted living facility, then it is usually billed as RHC and referred to as outpatient.

41.       Once a beneficiary elects to receive hospice services, Medicare will not cover treatment intended to cure the terminal illness and/or related conditions. The beneficiary, once on hospice, waives all rights to traditional Medicare Part A payments for treatment related to the terminal illness.

## UPHC BACKGROUND

42.       UPHC is a hospice care provider located at 1811 First Oaks St., Suite 120, Richmond, TX, 77406. On May 28, 2019, Ogudo became the new Registered Agent for UPHC. On June 14, 2019, Ogudo was added as President and the other officers/director's names were removed.

43.       Medicare Enrollment and Certification documents reflect that UPHC enrolled with Medicare on March 8, 2019, as a hospice provider. The Medicare enrollment documents include a purchase agreement indicating Ogudo purchased UPHC on May 29, 2019. On July 17, 2019, Medicare approved the change of ownership of UPHC to Ogudo, indicating that 100% of the ownership was transferred to Ogudo.

44.       Ogudo is the sole signatory on UPHC's Chase bank accounts where Medicare monies were deposited and payments to group homeowners and managers were debited.

45.         In March 2020, Ogudo enrolled with Medicaid.  Ogudo signed the application as

the owner of UPHC dated March 6, 2020, and signed the contract dated March 19, 2020, as

the Authorized Representative of UPHC.

46.         From January 1, 2019, through November 9, 2023, UPHC billed Medicare

approximately $90 million in Medicare Part A Hospice claims utilizing 1,964 unique

Medicare beneficiary IDs. Based on those claims, Medicare paid UPHC approximately $63

million. One attending physician ("top attending physician") represents over half the total

claims. UPHC billed Medicare approximately $56 million in hospice services and was paid

approximately $39 million with that attending physician.  Of the total 1,964 UPHC

Medicare beneficiaries, the top attending physician was listed as the attending physician for

approximately 1,133 UPHC Medicare beneficiaries.

### MEDICARE CLAIMS ANALYSIS OF GROUP HOME RESIDENTS AND PAYMENTS TO GROUP HOME OWNERS AND MANAGERS

47.         Through witness interviews and local law enforcement actions at Houston-area

group homes and assisted living facilities, investigators identified more than 80 UPHC

Medicare beneficiaries who reside in a group home or assisting living facilities. Based on

an analysis of UPHC's billing to Medicare, the residents of each group home are on hospice

services for months or even years, often with overlapping time periods, and almost all are

still alive.

48.         Based on bank records, between January 7, 2019, and August 14, 2023, UPHC paid

one owner of group homes (or his company) $559,489.  Investigators identified at least 14

residents of those group homes who have been billed for hospice services to Medicare by

UPHC for a total paid amount of approximately $913,677.04.

49.　　　　Based on UPHC's ADP payroll records, between January 31, 2020, and June 30, 2023, UPHC paid the facility manager at one of these homes $186,010.00. On December 13, 2019, that individual was paid $4,000 by check from UPHC, signed by Ogudo, with a memo line of "paycheck for [LASTNAME]" which actually contained the last name of a resident of that group home. In 2020, 2021, and 2022, the facility manager was paid in several checks from UPHC in even number amounts, from $4,000 to $9,200, signed by Ogudo, with memo lines referencing "care giver".

50.　　　　Based on UPHC's ADP payroll records, between January 2021 and December 2022, UPHC paid another group home owner $36,400.00. Investigators identified at least 14 residents under the care of that owner who have been billed for hospice services to Medicare by UPHC for a total paid amount of approximately $844,633.40.

51.　　　　Based on UPHC's ADP payroll records, between June 5, 2020, to June 30, 2023, UPHC paid yet another group home owner $222,000. Investigators identified at least 12 residents of that owner's group homes who have been billed for hospice services to Medicare by UPHC for a total paid amount of approximately $833,232.01.

52.　　　　Based on UPHC's ADP payroll records, between December 31, 2021, and June 30, 2023, UPHC paid another group home owner $83,880. Investigators have identified at least 5 residents of that group home who have been billed for hospice services to Medicare by UPHC for a total paid amount of approximately $533,100.15.

53.　　　　Based on UPHC's ADP payroll records, between December 18, 2020, and June 30, 2023, UPHC paid a group home owner $226,475. Investigators identified at least 18 residents of the group home who have been billed for hospice services to Medicare by UPHC for a total paid amount of approximately $1,064,152.07.

54.        In March 2023, investigators interviewed the owner of a group home(s). That owner told investigators that a UPHC employee approached her to put her residents on hospice services. The owner said that the UPHC employee and a UPHC nurse would come to the group home and check the residents' blood pressure and provide medications.  The owner said that the UPHC employee offered to pay money to the owner, but after owner refused, the UPHC employee provided the owner with $800.00 to $1,000.00 in groceries per month in exchange for allowing UPHC to sign up the owner's residents for hospice services. Investigators observed several of that owner's residents as alive and in general good health. Investigators have identified at least 11 residents of that owner's group homes who have been billed for hospice services to Medicare by UPHC (10 residents started on the same day) for a total paid amount of approximately $353,609.93.

55.        In October 2023, investigators interviewed another group home owner. That owner told investigators that the group home had seven residents; four of those residents were present during the interview: That owner cooks and cleans for the clients. At a meeting of the Houston Association of Group Homes, the owner met a woman who told the owner about the opportunity to get paid to be a home health aide for the residents. The woman put the owner in touch with UPHC.

56.        This owner attended orientation at UPHC, where the owner completed an application and other paperwork, including a W-4 form. The owner left with sign-in sheets to keep track of worked hours. A nurse named "Dera" (likely Ogudo, although the owner was unable to identify her photo) came to the group home and assessed each group home resident. Thereafter, a UPHC nurse practitioner ("NP") would visit with the residents weekly to check their medications and help with any medical issues. UPHC provided a

pharmacy to deliver medications, and all prescriptions were prescribed under the top attending physician for UPHC. The owner has never seen that physician.

57.     This owner believed that two of her patients were being signed up for palliative care, not hospice, but also understood that hospice was for someone that is dying. The owner explained that one patient had serious health issues in 2019 and nearly died but was doing much better. That patient was currently going to the VA for ongoing medical care; another resident has a primary care doctor to treat him. (Hospice treatment is not appropriate for patients that are receiving ongoing life-sustaining or long-term medical treatment for non-terminal issues.)

58.     One patient told investigators that he suffers from deteriorating kidneys, leg and feet numbness, a bad heart, and COPD. The patient believed he was on hospice services with UPHC but has been in and out of the hospital and rehab due to severe leg pain across at least two years. That individual said he pays rent to stay at the group home, which he considers an assisted living facility. Another patient told investigators he was not on hospice services (but investigators confirmed UPHC was billing this patient for hospice care). That patient stated that the UPHC NP did look at his foot one time, and also that he sees a Chaplain. The patient said he has never been told he is terminally ill. The patient had a stroke in 2017, is partially paralyzed, and has high blood pressure, but is otherwise in good health.

59.     According to the group home owner, payment was at an hourly rate (typically $20 an hour), $500 to $600 a week, through ADP by UPHC to be a "caregiver" for the group home residents (that the owner already cared for) until early 2023. The owner documented the hours spent cooking, cleaning, washing clothes, and helping the residents if they were

sick on the UPHC time sheets, and she would turn them into UPHC in-person or by mail. As UPHC enrolled more of the owner's residents, the owner documented more hours on the UPHC time sheet and earned more money. Investigators have identified at least 5 residents of the group home(s) who have been billed for hospice services to Medicare by UPHC for a total paid amount of approximately $441,172.79.

### UPHC Medicare Claims Analysis

60.      Investigative analysts obtained and reviewed Medicare Part A and Part B claims data associated with UPHC queried via One Program Integrity Business Objects. From January 1, 2019, through November 9, 2023, UPHC submitted hospice claims to Medicare utilizing 1,964 unique beneficiary IDs and of the 1,964 beneficiaries:

61.      Approximately 770 beneficiaries (39.2% of reviewed UPHC patients) were billed for hospice services for a period in excess of six months. The typical hospice patient is not expected to survive past six months of hospice care.

62.      At least 1,235 beneficiaries (62.88 %) were still alive as of November 9, 2023. This is despite UPHC beginning to offer end-of-life hospice services under Ogudo's control in mid-2019.

63.      Approximately 363 beneficiaries had dates of death listed with their last UPHC service date and an additional 47 had dates of deaths within seven days. This indicates that the majority of UPHC hospice patients are not succumbing to their illnesses, as is expected of a hospice provider; instead, this low death rate is indicative of the fact that UPHC is fraudulently enrolling otherwise healthy patients on hospice services.

64.      At least 388 beneficiaries had denied claims with other providers due to their hospice status after being placed on hospice by UPHC. This indicates that these individuals

were discharged by UPHC and required ongoing day-to-day medical treatment, rather than expiring as would be expected if they were properly qualifying hospice patients.

65.     Furthermore, approximately 1,349 beneficiaries did not have Medicare claims with other providers utilizing the same diagnosis codes that UPHC billed for. This is also evidence of fraud, as independent diagnoses of these beneficiaries did not match the diagnosis codes submitted by UPHC to support a hospice claim.

### Medicare Beneficiary Interviews

66.     From June 8, 2020, through October 5, 2023, Medicare's Benefits Integrity Unit received at least 28 complaints regarding UPHC beneficiaries. The complaints were self-reported or from family member or associates who claimed these UPHC beneficiaries did not receive hospice services, did not know UPHC, and/or were not terminally ill.

67.     Since November 2022, investigators have interviewed well in excess of 100 individuals: UPHC Medicare beneficiaries, their families, their caregivers, or other individuals with personal knowledge of their condition. The investigation determined that fewer than five of these individuals are properly classified as hospice patients. (Incredibly, for at least one of the "legitimate" patients, UPHC also enrolled an otherwise healthy, co-habitant family member for hospice services – presumably so that UPHC could double bill any visits to this location.)

68.     These UPHC Medicare beneficiaries and/or their caregivers almost universally told investigators that they were not terminally ill, did not receive hospice services, and/or were not aware that they were on hospice services. Many Medicare beneficiaries reported having difficulties accessing care with their regular physician during the time period that UHPC was billing for hospice services. (This is because once the beneficiaries were enrolled in

hospice by UPHC, they were no longer eligible to receive continuing day-to-day or life-sustaining medical care.) UPHC's fraudulent enrollments caused many patients to lose their standard access to health care, because UPHC's submissions indicated to Medicaid/Medicare that those patients were now receiving hospice care at end-of-life.

69.       In December 2019, Medicare received a hotline complaint from the daughter and power of attorney for a Medicare beneficiary. In the complaint, the daughter alleged that Ogudo signed up her father for medically unnecessary hospice services with UPHC without his knowledge. The daughter told Medicare that her father is not terminally ill. According to the daughter, UPHC and Ogudo did not have authorization to proceed with services but billed Medicare anyways. As a result, another provider for was unable to treat him. The complainant provided a business card for Ogudo with Ogudo's device's phone number written in black marker. The complainant directly contacted UPHC to demand her father be unenrolled from hospice care with UPHC. Despite this, UPHC continued to bill Medicare for providing hospice services to this patient for several years after this complaint and was paid approximately $159,647.15 by Medicare over the course of that patient's care.

70.       On April 13, 2023, investigators interviewed two UPHC Medicare beneficiaries, a married couple. The husband told investigators that he thought he was receiving home health services.  He explained that every Tuesday, a male nurse would stop by and ask him what medications needed to be refilled.  He said that his primary care physician ("PCP") was unaware that he was on hospice services, and never recommended him for hospice. This beneficiary said that his PCP was only treating him for diabetes, high blood pressure, and a heart condition.

71.       The wife told investigators that she also thought she was signed up for home health services and was not initially aware that she was a hospice patient.  She said a male nurse would come to their house. According to her, at some point, she reviewed her explanation of benefits from Medicare and found out that she was enrolled in hospice. She then contacted the woman that signed her up initially. The woman told her she was no longer on hospice. Investigators also interviewed the husband and wife's cardiologist. The cardiologist told investigators that he was unaware that those individuals were on hospice. The cardiologist reviewed his records for those individuals and saw that he had treated them while they were on hospice. The cardiologist told investigators that doctors do not perform cardiology procedures on hospice patients. From December 20, 2019, through August 5, 2022, UPHC billed Medicare for providing hospice services to the husband and was paid approximately $150,853.90. From December 19, 2019, through August 1, 2022, UPHC billed Medicare for providing hospice services to the wife and was paid approximately $150,390.08. The top attending physician at UPHC was listed under UPHC's claims for both.

72.       On April 10, 2023, investigators interviewed another married couple that were UPHC Medicare beneficiaries. They both said that they thought they were receiving home health care services and not hospice care.  The couple said their neighbor referred them to UPHC. UPHC employees would visit them and take their blood pressure. The couple said that when they needed medications, the UPHC attendant would contact the top attending physician for UPHC who would authorize the medications.  On May 1, 2023, investigators interviewed the couple's PCP. That doctor told investigators that she was unaware that the couple was receiving hospice services and that she had been treating them since 2016 or

2017. The doctor told investigators that she was seeing one of the couple regularly for heart issues, diabetes, gout, and high blood pressure, and seeing the other regularly for diabetes, high blood pressure, and chronic back issues. The doctor could only recall one patient who had ever been referred to hospice: a lung cancer patient. Despite this, from November 7, 2019, through July 6, 2022, UPHC billed Medicare for providing hospice services to one of the couple and was paid approximately $152,729.73. From November 7, 2019, through July 13, 2022, UPHC billed Medicare for providing hospice services to the other individual and was paid approximately $125,315.09.  The attending physician listed under UPHC's claims was the same top attending physician for UPHC.

73.        On April 13, 2023, investigators interviewed two more UPHC Medicare beneficiaries. Both reside in a group home. One individual told investigators that she was not receiving any hospice services. She told investigators that a UPHC NP comes to her group home and delivers medicine, and that another health care professional comes once a month to provide psychological services. The NP checks her blood pressure and pulse once per month and stays for about 25 minutes. She stated that UPHC sounds familiar, but she is not terminally ill and knows what hospice is for. The other individual also told investigators that she did not need hospice care, and that she actually helps cook and clean for her fellow residents at the group home. From January 11, 2020, through November 14, 2022, UPHC billed Medicare for providing hospice services to one of these individuals and was paid approximately $153,940.08.  From January 1, 2020, through November 14, 2022, UPHC billed Medicare for providing hospice services to the other and was paid approximately $163,360.62.   Again, the attending physician listed under UPHC's claims for these individuals was the top attending physician for UPHC beneficiaries. On May 1, 2023,

investigators interviewed a nurse practitioner, who is responsible for psychiatric treatment of residents, at that group home. The NP said that he/she was unaware that those two patients were on hospice and told investigators that neither met the medical standard for hospice care.

74.     On October 24, 2023, investigators interviewed two UPHC hospice beneficiaries. These two are family members who reside together. One was observed riding his bike with a grocery bag in hand as investigators approached. When asked, he told investigators that he rides his bike everywhere. He said that his family member also rides her bike and was currently on a bike ride. He also told investigators that he recently had a prostate abscess, but that it had healed; he did not mention any other serious health issues. According to his beneficiary, the other beneficiary has lung and heart issues and is addicted to cocaine. He stated that he has not had hospice or home health services, but he did remember signing up for a program. He said he met a lady in the corner store who asked him if he was on Medicare. The unknown female paid him $50 to sign up for a government program that would deliver his medications. The unknown female also paid him $50 for referring his family member to this unknown program. Once a week, a nurse named would come and take his vitals. Once per month, medication that the individual state he did not need would arrive; he would throw it in the trash. When this program ended, he signed a form that an unknown male brought him; he stated that the unknown female recently tried again to sign him up for $100, but he declined.  From June 24, 2022, through April 3, 2023, UPHC billed Medicare for providing hospice services to the interviewee and was paid approximately $47,355.62. From June 27, 2022, through April 3, 2023, UPHC billed Medicare for providing hospice services to his family members and was paid approximately $46,888.67.

The attending physician for the non-present family member was the same top attending physician.

## FINACIAL INVESTIGATION

75.     Between in or around October 2019, through in or around August 2023, Ogudo received approximately $59 million from Medicare and Medicaid predicated from the scheme to defraud and as a result of the illegal kickbacks she paid to group home owners. The financial investigation did not uncover any significant sources of additional income for UPHC or Ogudo; the vast majority of funds received by UPHC (and ultimately Ogudo) constitute fraud proceeds. In fact, UPHC was permeated by the fraud and conducted little legitimate business in comparison to the fraudulent and kickback tainted billing. The initial Medicare fraud proceeds were deposited into Ogudo's UPHC account at Comerica Bank ending in 1534 (COMERICA UPHC 1534).  From October 17, 2019, through November 21, 2019, COMERICA UPHC 1534 received credits of approximately $232,885.50 from Medicare.

76.     Ogudo then started using a UPHC Cadence Bank account ending in 4630 (Cadence UPHC 4630) which was opened on or about July 1, 2019, to receive the Medicare fraud proceeds.  From December 3, 2019, through April 21, 2020, CADENCE UPHC 4630 received credits of approximately $2,867,206.20 from Medicare.

77.     In May 2020, Ogudo started using a UPHC JP Morgan Chase Bank account ending in 2871 (UPHC PRIMARY), which was opened on or about March 2, 2020, to receive the Medicare fraud proceeds.  From May 1, 2020, through August 31, 2023, there were approximately $51,291,296.45 in Medicare credits to UPHC PRIMARY.

78.     Meanwhile, Ogudo arranged for the Medicaid funds which were also derived from the fraud scheme to be deposited into another, JP Morgan Chase Bank account ending in 0473 (UPHC SECONDARY), which was opened on or about March 31, 2020.  From June 24, 2020, through September 8, 2023, UPHC SECONDARY received credits totaling approximately $4,701,102.37 from Medicaid.

79.     The following chart details the receipts of the Medicare/Medicaid funds into the UPHC accounts:



80.     A review of COMERICA UPHC 1534 and CADENCE UPHC 4630 (both now closed) revealed that the primary source of the funds in both accounts consisted of illegal proceeds – specifically, fraudulent Medicare payments.  CADENCE UPHC 4630 conducted $900,000.00 in inter account transfers to an Ogudo personal Cadence Bank account ending in 2885 (CADENCE Ogudo 2885) (now closed) followed by the same amounts of transfers ($900,000.00) back to CADENCE UPHC 4630.  There is no obvious economic or business reason for this intermingling of corporate and personal funds.  The Medicare credits to CADENCE UPHC 4630 represented approximately 92% of the total credits to that account from December 1, 2019, through April 30, 2020.

81.     In or around Spring 2020, Cadence Bank closed Ogudo's UPHC account (CADENCE UPHC 4630) and Ogudo's personal account (CADENCE Ogudo 2885) due to

a large amount of unexplained cash deposits and the suspicious movements of Medicare funds to a personal account.

82.        Due to the closures of the Cadence accounts, in March 2020, Ogudo opened four UPHC business checking accounts at JP Morgan Chase Bank including: UPHC PRIMARY, UPHC SECONDARY, JPMC UPHC 9211, and JPMC UPHC 1769, with Ogudo being the only signor on the accounts.  Once opened, UPHC PRIMARY and UPHC SECONDARY were utilized as the account to receive deposits of government funds.

83.        Subsequently in October 2022, Ogudo opened three additional accounts for UPHC at Midfirst Bank including Midfirst UPHC 0412, Midfirst UPHC 0390, and Midfirst UPHC 0420, with Ogudo being the only signor on the accounts.

84.        Lastly, Ogudo opened more accounts including two personal accounts at Midfirst Bank (MIDFIRST Ogudo 0172 and MIDFIRST Ogudo 0180) in January 2023, a business account in the name of Sango Realty Associates LLC at Midfirst Bank (MIDFIRST SANGO REALTY) in March 2023, and a second Sango Realty Associates LLC account at Midfirst Bank (SANGO REALTY RENTS) in August 2023.  Ogudo is listed as the only account signor on all of the Midfirst Bank accounts.

85.        Beginning in or about May 2020, after receiving the Medicare funds in UPHC PRIMARY and the Medicaid funds in UPHC SECONDARY, Ogudo arranged for a large portion of the funds to be disbursed among several other financial accounts that Ogudo had established and utilized.  These accounts were primarily funded by proceeds moved between various Ogudo and UPHC related accounts, with generally no substantive sources of income beyond the fraud proceeds, except for SANGO REALTY RENTS which

apparently is used to deposit rent collections for Ogudo's commercial property (which was itself purchased with fraud proceeds and additional lender financing).

86.     Furthermore, a large portion of the funds were transferred between accounts controlled by Ogudo for no apparent legitimate economic or business purpose, in order to layer the funds to conceal their true source as part of the money laundering scheme.

87.     In addition to receiving (and laundering) fraud proceeds, the accounts were also utilized to pay kickbacks to relatives and associates, while a large portion of the fraud proceeds were used to personally enrich Ogudo. The laundered fraud proceeds were also used for the purchases of vehicles, to fund the construction of two luxury residences by Ogudo and used towards the purchase of a commercial property. The following chart lists the financial accounts belonging to Ogudo that were utilized to receive/disburse fraud proceeds. The column labeled "% OF FRAUD" summarizes the approximate percent of total deposits/credits into the account listed that are traceable to proceeds from UPHC. The financial investigation determined that for the analyzed, likely fraud proceeds typically constituted over 95% of the total deposits into those accounts (subject to some variation depending upon the time frame covered by the analysis).

| BANK | ACCOUNT NUMBER | REFERENCE NAME IN AFFIDAVIT | % OF FRAUD |
|------|------|------|------|
| Comerica | 1881701534 | COMERICA UPHC 1534 | 98 |
| Cadence | 5500124630 | CADENCE UPHC 4630 | 92 |
| JPMC | 606232871 | UPHC PRIMARY | 96 |
| JPMC | 3846709211 | JPMC UPHC 9211 | 99 |
| JPMC | 622600473 | UPHC SECONDARY | 96 |
| JPMC | 3826771769 | JPMC UPHC 1769 | 99 |
| MIDFIRST | 8453000412 | MIDFIRST UPHC 0412 | 98 |
| MIDFIRST | 8453000390 | MIDFIRST UPHC 0390 | 99 |
| MIDFIRST | 8453000420 | MIDFIRST UPHC 0420 | 99 |
| MIDFIRST | 8453000900 | MIDFIRST SANGO REALTY | 99 |
| JPMC | 3700920292 | JPMC DERA 0292 | 98 |
| JPMC | 955222922 | JPMC DERA 2922 | 95 |
| JPMC | 536676187 | JPMC DERA 6187 | 96 |
| MIDFIRST | 8451000172 | MIDFIRST DERA 0172 | 98 |
| MIDFIRST | 8451000180 | MIDFIRST DERA 0180 | 99 |

88.     The movement of funds in this manner – from a business account through a web of related, but distinct, financial accounts is strong evidence of concealment money laundering, in violation of Title 18, United States Code Section 1956(a)(1)(B)(i).  Utilizing a web of financial accounts and related business accounts often provides a veneer of legitimacy to fraud and money laundering schemes and serves, at least in part, to conceal the true nature, source, and ownership of the criminal proceeds.

89.     Conducting financial transactions with fraud proceeds in order to promote the underlying fraud scheme is a violation of Title 18, United States Code, Section 1956(a)(1)(A)(i). (E.g., laundering fraud proceeds in order to effectuate kickback payments.) Furthermore, any financial transactions that involves greater than $10,000 in fraud proceeds also constitutes violations of the money laundering "spending statute," codified at Title 18, United States Code, Section 1957.

**TRANSFERS OF FRAUD PROCEEDS TO/FROM UPHC JPMC ACCOUNTS**

90.         The financial accounts that Ogudo utilized to transfer the fraud proceeds from UPHC PRIMARY, which received approximately $51.2 Million in Medicare fraud proceeds from May 2020 through August 2023, included several accounts: a JP Morgan Chase UPHC account ending in 9211 ("JPMC UPHC 9211"), which received $21.5 Million in fraud proceeds, a JP Morgan Chase Ogudo personal account ending in 2922 ("JPMC Ogudo 2922") which received $3.5 Million in fraud proceeds,  a JP Morgan Chase UPHC account ending in 1769 ("JPMC UPHC 1769") which received $2.5 Million in fraud proceeds, and UPHC SECONDARY which received $604K in fraud proceeds.

91.         The financial accounts utilized by Ogudo to transfer the fraud proceeds from UPHC SECONDARY, which received approximately $4.7 million in Medicaid fraud proceeds, from June 2020 through September 2023, included several accounts:  JPMC UPHC 9211 which received $3.8 Million in fraud proceeds, UPHC PRIMARY which received $1.3 Million in fraud proceeds, JPMC UPHC 1769 which received $906K in fraud proceeds, and a JP Morgan Chase Ogudo account ending in 2922 ("JPMC Ogudo 2922") which received $86K in fraud proceeds.

92.         JPMC UPHC 9211 is an example of an account that Ogudo opened which basically served to funnel substantial amounts of fraudulent funds from/to UPHC PRIMARY and UPHC SECONDARY.  As indicated above, JPMC UPHC 9211 received fraud proceeds totaling $21.5 Million from UPHC PRIMARY, $3.8 Million from UPHC SECONDARY, and $105K from JPMC UPHC 1769.  The funds from UPHC PRIMARY and UPHC SECONDARY represented approximately 99% of the credits to JPMC UPHC 9211.  JPMC

UPHC 9211 then transferred a total of $14.9 Million back to UPHC PRIMARY and $8.7 Million to UPHC SECONDARY.

93.     JPMC UPHC 1769 received fraud proceeds totaling $2.5 Million from UPHC PRIMARY and $906K from UPHC SECONDARY which represented approximately 99% of the credits to JPMC UPHC 1769.  The financial accounts utilized by Ogudo to transfer the fraud proceeds from JPMC UPHC 1769 included UPHC PRIMARY, which received $2.5 Million and UPHC SECONDARY, which received $699K.

94.     The following chart details the primary movements of fraud proceeds from UPHC PRIMARY and UPHC SECONDARY into other UPHC accounts along with personal accounts owned/controlled by Ogudo.  This movement of fraud proceeds through an extensive web of business and personal accounts is strong evidence of money laundering, in violation of 18 U.S.C. § § 1956, 1957:



**TRANSFERS TO MIDFIRST UPHC AND SANGO REALTY ACCOUNTS**

95.         Beginning in October 2022, Ogudo also utilized UPHC PRIMARY and UPHC SECONDARY to fund UPHC accounts and personal accounts at Midfirst Bank. Specifically, Ogudo transferred fraud proceeds from UPHC SECONDARY to a UPHC account at Midfirst Bank ending in 0412 (MIDFIRST UPHC 0412) which received $6.5 Million in fraud proceeds.  Ogudo also transferred fraud proceeds from UPHC PRIMARY to Midfirst Bank accounts including a UPHC account at Midfirst Bank ending in 0390 ("MIDFIRST UPHC 0390") which received $490,000.00; a Sango Realty Associates, LLC, account at Midfirst Bank ending in 0900 ("MIDFIRST SANGO REALTY) which received $300,000.00; a UPHC account at Midfirst Bank account ending in 0412 (MIDFIRST UPHC 0412) that received $100,000.00; an Ogudo personal account at Midfirst Bank ending in 0180 ("MIDFIRST Ogudo 0180") which received $100,000.00; and an Ogudo personal account at Midfirst Bank ending in 0172 ("MIDFIRST Ogudo 0172") which received $100,000.00 in fraud proceeds.  The investigation could discern no legitimate business or economic purpose for these transfers.

96.         The following chart depicts the transfers primarily consisting of fraud proceeds from UPHC PRIMARY and UPHC SECONDARY to the Midfirst Bank accounts:



## PAYROLL PAYMENTS/TRANSFERS TO OGUDO PERSONAL ACCOUNTS

97.        As further evidence of the fraudulent scheme, Ogudo received suspiciously large sums of money identified as "payroll" into two of Ogudo's personal accounts at JP Morgan Chase ending in 0292 and 2922 (JPMC Ogudo 0292 and JPMC Ogudo 2922), which consisted of fraud proceeds from UPHC PRIMARY.  Ogudo also received wages from ADP (a payroll processor used by UPHC) during the same time period, which likewise were funded with fraud proceeds from UPHC PRIMARY.

98.        A review of UPHC PRIMARY revealed that from May 1, 2020, through September 11, 2023, there were payments to ADP from UPHC PRIMARY totaling approximately $17.3 million.  The payments listed ADP Wage Pay, ADP Tax, ADP 401k, ADP Payroll Fees, and ADP Wage Garn [sic].  Previous payments to ADP were identified as coming from CADENCE UPHC 4630.

99.      Ogudo received wages amounting to $2,759,393.48 from ADP that were credited to JPMC Ogudo 0292 from April 10, 2020, through September 8, 2023.  The direct deposits were labeled, "United Palliativ [sic] Direct Dep."

100.      The following chart details the breakdown of the ADP wage amounts, funded by fraud proceeds, paid to Ogudo along with the time periods of the payments (through June 30, 2023):

| PAYEE | YEAR | TIME PERIOD | GROSS WAGES | BONUS AMOUNTS | NET WAGES |
|-------|------|-------------|-------------|---------------|-----------|
| DERA | 2020 | 2/28/2020-12/31/2020 | $226,292.24 | $129,500.00 | $200,570.42 |
| DERA | 2021 | 1/15/2021-12/30/2021 | $556,000.00 | $370,000.00 | $501,396.60 |
| DERA | 2022 | 1/14/2022-12/30/2022 | $1,310,000.00 | $890,000.00 | $1,171,465.56 |
| DERA | 2023 | 1/13/2023-06/30/2023 | $715,000.00 | $520,000.00 | $638,821.55 |
| **TOTAL** | | | **$2,807,292.24** | **$1,909,500.00** | **$2,512,254.13** |

101.      The ADP payments to Ogudo included the following payments which were characterized as "Bonus Non-Tax"; $129,500.00 in 2020, $370,000.00 in 2021, $890,000.00 in 2022, and $520,000.00 through June 30, 2023.

102.      From July 21, 2020, through January 18, 2022, Ogudo also received a total of $801,669.00 in "payroll" payments directly to JPMC Ogudo 2922 from UPHC PRIMARY. A review of UPHC PRIMARY indicated that the payments were labeled, "United Palliativ Payroll" and subsequently "Online Realtime Payroll Payment".  After the payments labeled "payroll" ceased in January 2022, UPHC PRIMARY immediately started sending payments to JPMC Ogudo 2922 identified as "Online Realtime Vendor Payment" further described as "Uphc transportation".  From January 2022 through March 2023, there were payments totaling $609,300.00 from UPHC PRIMARY (a corporate account) to JPMC Ogudo 2922 (a personal account) labeled "Uphc transportation".

103.       Previously, in February and March 2020, there were also three payments labeled "United Palliativ Direct Dep." totaling $6,751.40 that were credited to JPMC Ogudo 2922, before the payroll payments were switched to JPMC Ogudo 0292 in April 2020.

104.       Since 2020, Ogudo has received in excess of $3.5 Million in "payroll" from UPHC. The fact that Ogudo was receiving an incredibly large salary through ADP that was funded from UPHC PRIMARY and credited to JPMC Ogudo 0292, while receiving substantial additional "payroll" payments from UPHC PRIMARY directly into JPMC Ogudo 2922, deviates from normal business practices.  In addition, the so-called vendor payments to "Uphc transportation" that were credited to Ogudo's personal account (JPMC Ogudo 2922) right after the "payroll" payments stopped. This is likely another example of money laundering: since Ogudo is the sole owner of UPHC, it would not be normal business practice to use a personal account to contract for services provided to her own company (UPHC).  Regardless of the several differing characterizations created by Ogudo and/or ADP, these payments were funded almost entirely with illegal proceeds of the fraud scheme.

**EVIDENCE OF KICKBACKS TO GROUP HOMEOWNERS AND MANAGERS**

105.       The investigation also revealed that there were group homeowners and/or managers who were also actively marketing among their residents on behalf of UPHC and were collecting W-2 wages or 1099 wages through ADP in 2020, 2021, and 2022 from UPHC. In addition, several of these group homeowners and/or managers were also receiving separate payments from UPHC accounts. As these payments were funded with fraud proceeds and were also used to perpetrate the kickback scheme (which further grew the fraud/kickback scheme), these payments also represent violations of Title 18 U.S.C. § 1956(a)(1)(A)(i) (promotional money laundering).

106.        The following chart depicts some of the group homes that the group home owners own/operate along with the number of beneficiaries billed for by UPHC and the amounts that Medicare/Medicaid paid in claims. They are color coded to represent which individual owner the payments correspond to.

| UPHC BENES | CLAIM PAYMENTS |
|---|---|
| 14 | $726,611.11 |
| 5 | $364,354.65 |
| 20 | $1,119,287.15 |
| 14 | $844,633.40 |
| 5 | $533,100.15 |
| 13 | $852,625.06 |
| 6 | $370,808.31 |
| 1 | $79,076.85 |

107.        The following table is a list of the W-2 "Wages" or the 1099-Misc. "Wages" that each five different group home owners received as kickbacks from UPHC through ADP.

| To (via ADP) | From (via ADP) | Total Payments via ADP |
|---|---|---|
| 12/31/2020 | 6/30/2023 | $      186,010.00 |
| 3/2/2021 | 6/30/2023 | $       43,100.00 |
| 6/5/2020 | 6/30/2023 | $      222,000.00 |
| 12/31/2021 | 6/30/2023 | $       83,880.00 |
| 12/18/2020 | 6/30/2023 | $      226,475.00 |

108.        The following chart summarizes the total payments of additional illegal kickbacks (coming directly from both UPHC business and Ogudo personal accounts) from each of the accounts to seven group-home owners:

| UPHC PRIMARY | UPHC SECONDARY | CADENCE UPHC 4630 | COMERICA UPHC 1534 | JPMC DERA 2922 | JPMC DERA 0292 | JPMC DERA 6187 | TOTALS |
|---|---|---|---|---|---|---|---|
| $190,702.00 | | $ 148,800.00 | | $211,287.00 | $ 3,700.00 | $ 5,000.00 | $ 559,489.00 |
| | | | | $ 26,623.00 | | | $26,623.00 |
| $687,360.00 | $129,000.00 | $161,145.60 | $1,194.96 | $35,260.00 | $22,050.00 | $60.00 | $1,036,070.56 |
| $37,400.00 | | $54,705.72 | $4,000.00 | $515.00 | | | $96,620.72 |
| $52,100.00 | | $8,720.00 | | | | | $60,820.00 |
| $6,000.00 | | | | | | | $6,000.00 |
| $39,649.54 | | $1,500.00 | | | | | $41,149.54 |

109.     Upon information and belief, these ADP "payroll" payments and additional payments are illegal kickbacks to these individuals for actively marketing and recruiting additional beneficiaries for UPHC, even though the group homeowners were most likely receiving payments from the U.S. Government for their client services at the same time. Additionally, group home managers and facilitators would have received payments from their respective employers and should not have been paid directly by UPHC.

**OGUDO BUSINESS ACCOUNTS**

*1.  Comerica Bank Checking Account #******1534 (COMERICA UPHC 1534)*

110.     Comerica Bank records reflect that Checking Account #1881701534 titled to United Palliative & Hospice Care Inc. ("COMERICA UPHC 1534") was opened on or about November 2, 2017.  Ogudo became the signor on the account in about July 2019.  The account was closed on April 14, 2020.

111.     On or about October 1, 2019, Comerica UPHC 1534 had a beginning balance of $585.35.  From on or about October 1, 2019, to on or about April 14, 2020, COMERICA UPHC 1534 received total credits of $286,156.48 which included credits of $232,885.50 (81%) from Medicare, a $30,000.00 (10%) deposit, $21,000.00 (7%) from Ario Global

Developers, and two cash deposits totaling $2,135.49 (1%).  Ario Global Developers is a business owned/operated by Ogudo's ex-husband.  The remaining credits totaled $135.49 which was described as uncollected bank fees.

112.     A review of the credits to COMERICA UPHC 1534 revealed that the credits from Medicare which totaled $232,885.50 occurred between October 17, 2019, through November 21, 2019.  During this time period, COMERICA UPHC 1534 was the UPHC account that received Medicare deposits.

113.     The $30,000.00 credit from Ario Global Developers which represented 10% of the total credits to COMERICA UPHC 1534 consisted of a withdrawal and re-deposit on the same day (November 21, 2019).   In addition, the $21,000.00 credit from Ario Global Developers which represented 7% of the total credits to COMERICA UPHC 1534 was preceded by a withdrawal to Ario Global Developers for the same amount $21,000.00 a few days earlier.

114.     Since the $30,000.00 and the $21,000.00 credits originated in COMERICA UPHC 1534, the total of $51,000.00 is not included in the overall credit/debit totals to the account. As a result, the $232,885.50 credited to COMERICA UPHC 1534 from Medicare accounted for approximately 98% of the total credits to COMERICA UPHC 1534 during the above referenced time period.

115.     A review of the debits from COMERICA UPHC 1534 included, $89,010.00 in transfers to CADENCE UPHC 4630, $60,000.00 in payments to a builder who was constructing a residence for Ogudo, $39,500.00 in cash withdrawals, and a $4,000.00 transfer to JPMC Ogudo 2922.

116.     An analysis of COMERICA UPHC 1534 determined that approximately 98% of the credits were derived from Medicare funds which were determined to be fraud proceeds.

### 2. *Cadence Bank Checking Account #\*\*\*\*\*\*4630 (CADENCE UPHC 4630) and Checking Account #5\*\*\*\*\*\*2885 (CADENCE Ogudo 2885)*

117.     Cadence Bank records reflect that Checking Account #\*\*\*\*\*\*4630 titled to United Palliative & Hospice Care, Inc. ("Cadence UPHC 4630") was opened on or about July 1, 2019.  Ogudo was the only signor on the account and appears to have signed the signature card on July 2, 2019.  The account was closed in or about April 2020.

118.     Cadence Bank records reflect that Checking Account #\*\*\*\*\*\*2885 titled to Dera Ogudo (CADENCE Ogudo 2885) was opened on or about October 10, 2019.  Ogudo was the only signor on the account and appears to have signed the signature card on October 10, 2019.

119.     On or about December 1, 2019, CADENCE UPHC 4630 had a beginning balance of $-938.44.  From on or about December 1, 2019, through April 30, 2020, CADENCE UPHC 4630 received total credits of $4,004,385.23 which included credits of $2,867,206.20 (72%) from Medicare (JM MAC SC/HHH-HCCLAIMPMT) labeled Insurance, $900,000.00 (22%) from an Ogudo account at Cadence Bank ending in 2885 (CADENCE Ogudo 2885), and three cash deposits totaling $11,800.00.  The remaining credits totaled $225,379.03 (6%) and consisted of $53,129.81 in returned checks (19 checks), $50,000.00 wire transfer credit on April 23, 2020, $20,000.00 wire transfer credit on April 24, 2020, $96,855.70 in check deposits on December 3, 2019, and December 5, 2019, and $5,393.52 in two ADP Wage Pay credits.

120.		The Medicare credits to CADENCE UPHC 4630 totaling $2,867,206.20 occurred between December 3, 2019, through April 21, 2020.  During this time period, CADENCE UPHC 4630 was the UPHC account that received Medicare deposits.  The following chart details the Medicare payments by month to CADENCE UPHC 4630:



121.		As indicated above, CADENCE UPHC 4630, a UPHC business account, received $900,000.00 in transfer credits from CADENCE Ogudo 2885, a personal account for Ogudo, from January 27, 2020, through March 5, 2020.  During the same time period, January 27, 2020, through February 26, 2020, CADENCE Ogudo 2885 sent $900,000.00 in transfer credits back to CADENCE UPHC 4630.  The investigation was unable to determine any legitimate economic or business purpose for these movements of funds between the two accounts.

122.		A review of CADENCE Ogudo 2885 revealed that the $900,000.00 in credits from CADENCE UPHC 4630 represented 99.9% of the total deposits to CADENCE Ogudo 2885 from the date the account was opened (October 10, 2019) through April 15, 2020.

123.     The following chart displays the dates and amounts of the transfers back and forth between CADENCE UPHC 4630 and CADENCE Ogudo 2885:

| DATE | ACCOUNT | CREDIT | DEBIT | REMARKS |
|---|---|---|---|---|
| 1/27/2020 | CADENCE UPHC 4630 | $10,000.00 | | FM CADENCE DERA 2885 |
| 1/27/2020 | CADENCE UPHC 4630 | | $2,000.00 | TO CADENCE DERA 2885 |
| 1/27/2020 | CADENCE UPHC 4630 | | $28,000.00 | TO CADENCE DERA 2885 |
| 1/27/2020 | CADENCE UPHC 4630 | | $100,000.00 | TO CADENCE DERA 2885 |
| 1/27/2020 | CADENCE UPHC 4630 | | $100,000.00 | TO CADENCE DERA 2885 |
| 1/30/2020 | CADENCE UPHC 4630 | $40,000.00 | | FM CADENCE DERA 2885 |
| 1/31/2020 | CADENCE UPHC 4630 | | $40,000.00 | TO CADENCE DERA 2885 |
| 2/3/2020 | CADENCE UPHC 4630 | | $80,000.00 | TO CADENCE DERA 2885 |
| 2/4/2020 | CADENCE UPHC 4630 | $10,000.00 | | FM CADENCE DERA 2885 |
| 2/5/2020 | CADENCE UPHC 4630 | $10,000.00 | | FM CADENCE DERA 2885 |
| 2/7/2020 | CADENCE UPHC 4630 | $50,000.00 | | FM CADENCE DERA 2885 |
| 2/12/2020 | CADENCE UPHC 4630 | $30,000.00 | | FM CADENCE DERA 2885 |
| 2/14/2020 | CADENCE UPHC 4630 | $10,000.00 | | FM CADENCE DERA 2885 |
| 2/18/2020 | CADENCE UPHC 4630 | $10,000.00 | | FM CADENCE DERA 2885 |
| 2/19/2020 | CADENCE UPHC 4630 | $10,000.00 | | FM CADENCE DERA 2885 |
| 2/21/2020 | CADENCE UPHC 4630 | | $120,000.00 | TO CADENCE DERA 2885 |
| 2/21/2020 | CADENCE UPHC 4630 | | $400,000.00 | TO CADENCE DERA 2885 |
| 2/24/2020 | CADENCE UPHC 4630 | $20,000.00 | | FM CADENCE DERA 2885 |
| 2/26/2020 | CADENCE UPHC 4630 | | $30,000.00 | TO CADENCE DERA 2885 |
| 2/27/2020 | CADENCE UPHC 4630 | $100,000.00 | | FM CADENCE DERA 2885 |
| 3/3/2020 | CADENCE UPHC 4630 | $400,000.00 | | FM CADENCE DERA 2885 |
| 3/5/2020 | CADENCE UPHC 4630 | $200,000.00 | | FM CADENCE DERA 2885 |
| **TOTALS** | | **$900,000.00** | **$900,000.00** | |

124.     Since the $900,000.00 in credits to CADENCE UPHC 4630 originated in CADENCE UPHC 4630, those credits will not be considered in the analysis of the overall credits to the account.  As a result, the $2,867,206.20 credited to CADENCE UPHC 4630 from Medicare accounted for approximately 92% of the total credits to CADENCE UPHC 4630 during the above referenced time period.

125.     A review of the debits from CADENCE UPHC 4630 included: $900,000.00 in transfers to CADENCE Ogudo 2885, $338,410.00 in payments to a builder, $220,000.00 to JPMC Ogudo 0292, $120,000.00 to an individual affiliated with UPHC, $100,000.00 to UPHC PRIMARY, $100,000.00 To EJ Motors (RE: loan), $76,000.00 to Ario Global Developers, $55,800.00 to Ogudo's husband, $42,500. to a business affiliated with Ogudo's husband, and $24,500. to JPMC Ogudo 2922.

126.     An analysis of CADENCE UPHC 4630 determined that approximately 92% of credits were derived from Medicare funds which were determined to be fraud proceeds.

127.     Additionally, as the overwhelming majority of the funds in UPHC or Ogudo personal accounts were fraud proceeds, there is a substantial likelihood that any transactions of greater than $10,000.00 constitute a violation of Title 18, United States Code, Section 1957. Although lowest intermediate balance tracing has not been fully completed for every transaction involving the seized accounts, the overwhelming percentage of fraud proceeds means that numerous violations of Section 1957 have necessarily occurred.

128.     A review of credits and debits to/from Cadence UPHC 4630 that were greater than $10,000.00 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| Cadence UPHC 4630 | | | | | |
|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| CADENCE DERA 2885 | $840,000.00 | 7 | CADENCE DERA 2885 | $898,000.00 | 8 |
| **Grand Total** | **$840,000.00** | **7** | JPMC DERA 0292 | $220,000.00 | 3 |
| | | | UPHC PRIMARY | $100,000.00 | 1 |
| | | | **Grand Total** | **$1,218,000.00** | **12** |

(Note: PMT Count denotes the number of payments/transactions in excess of $10,000.00)

### 3. JPMC Checking Account #*****2871 (UPHC PRIMARY)

129.     JP Morgan Chase records reflect that Chase Platinum Business Checking Account #*****2871 ("UPHC PRIMARY") titled to United Palliative & Hospice Care Inc., 1811 First Oaks St., Ste. 120, Richmond, TX 77406, was opened on or about March 2, 2020. "Ogudo – President" was the only signor on the account and appears to have signed the signature card on March 2, 2020.

130.     On or about March 2, 2020, UPHC PRIMARY had a beginning balance of $0.00. From on or about March 2, 2020, through on or about September 12, 2023, UPHC

PRIMARY received total credits of $72,462,107.12.  Of those credits, $51,291,296.45 (71%) was from Medicare (through JM MAC SCHHH PA) and was determined to be fraud proceeds.  Other credits to UPHC PRIMARY included $14,960,906.00 (21%) from JPMC UPHC 9211, $2,552,882.77 (3%) from JPMC UPHC 1769, and $1,397,100.00 (2%) from UPHC SECONDARY.  The remaining credits to UPHC PRIMARY totaled $2,259,921.90 (3%) and included, $775,907.12 in five deposits from the U.S. Treasury on June 6, 2023, and June 7, 2023, along with $718,500.00 in credits from a BRC account ending in 7002.

131.     The credits from Medicare and the other three accounts totaled $70,202,185.22, which together represented approximately 96% of the total credits to UPHC PRIMARY during the above referenced time frame.  From May 2020 through at least August 2023, UPHC PRIMARY was the UPHC account that received Medicare deposits.

132.     The monthly reimbursements from Medicare (JM MAC SCHHH PA) to UPHC PRIMARY between March 2020, and May 2023, are reflected as follows:



133.     A review of JPMC UPHC 9211, JPMC UPHC 1769, and UPHC SECONDARY revealed that those accounts were also primarily funded with fraud proceeds.  UPHC SECONDARY was the UPHC account that received MEDICAID deposits.

134.        As indicated above, UPHC PRIMARY received a total of $14,960,906.00 in transfers from JPMC UPHC 9211 from April 23, 2020, through September 8, 2023.  UPHC PRIMARY transferred a total of $21,593,812.96 to JPMC UPHC 9211 between June 3, 2020, through August 17, 2023.  There were two transfers totaling $35,000.00 from JPMC UPHC 9211 in April 2020 and May 2020 to UPHC PRIMARY prior to UPHC PRIMARY transferring funds to JPMC UPHC 9211.  JPMC UPHC 9211 had received those funds from JPMC Ogudo 0292 which were identified as originating in CADENCE UPHC 4630.

135.        UPHC PRIMARY received a total of $2,552,882.77 in transfers from JPMC UPHC 1769 from June 3,2020 through May 11,2022.  UPHC PRIMARY transferred a total of $2,533,100.00 to JPMC UPHC 1769 between March 3, 2020, through April 27, 2021.

136.        UPHC PRIMARY received a total of $1,397,100.00 in transfers from UPHC SECONDARY from June 18, 2020, through January 25, 2023.  UPHC PRIMARY transferred a total of $604,480.00 to UPHC SECONDARY between May 21, 2020, through December 28, 2021.

137.        The above referenced transfer amounts and date ranges of the transfers from/to UPHC PRIMARY to/from other accounts are listed in the following chart:

| FROM DATE | TO DATE | MAIN ACCOUNT | CREDIT | DEBIT | PAYEE/PAYOR ACCOUNT |
|---|---|---|---|---|---|
| 6/3/2020 | 8/17/2023 | UPHC PRIMARY | | $21,593,812.96 | JPMC UPHC 9211 |
| 4/23/2020 | 9/8/2023 | UPHC PRIMARY | $14,960,906.00 | | JPMC UPHC 9211 |
| 3/3/2020 | 4/27/2021 | UPHC PRIMARY | | $2,533,100.00 | JPMC UPHC 1769 |
| 6/3/2020 | 5/11/2022 | UPHC PRIMARY | $2,552,882.77 | | JPMC UPHC 1769 |
| 5/21/2020 | 12/28/2021 | UPHC PRIMARY | | $604,480.00 | UPHC SECONDARY |
| 6/18/2020 | 1/25/2023 | UPHC PRIMARY | $1,397,100.00 | | UPHC SECONDARY |

138.        A review of the debits from UPHC PRIMARY revealed that substantial amounts of funds were being spent for Ogudo's personal benefit and included payments to an entrenched network of associates whose combined efforts in cooperation with Ogudo

enhanced the effectiveness of the fraud scheme. A large portion of the monies in UPHC accounts were used for payments towards the construction of two luxury residences and the purchase of a commercial property, not related to UPHC business activities, by Ogudo (described below). These payments from UPHC PRIMARY included $2,579,000.00 paid to Ario Global Developers between May 14, 2020, through September 8, 2023, and $1,186,572.62 in payments to Challenge (Challenge Multi Family Construction) from October 4, 2021, through October 26, 2022.

139.    The transfers and payments from UPHC PRIMARY to Ogudo and/or other Ogudo accounts included payments totaling $3,509,669.00 to JPMC Ogudo 2922 from March 2, 2020, to March 28, 2023, a $70,000.00 check (#1041) payment credited to JPMC Ogudo 0292 on July 7, 2020, a $100,000.00 check (#1807) deposited to MIDFIRST Ogudo 0172, and a $100,000.00 check (#1806) deposited in MIDFIRST Ogudo 0180.

140.    The debits from UPHC PRIMARY also included payments totaling $650,307.00 and $22,005.00 to two businesses known as GMS Health, LLC, aka GMS and J & N Tender Care, respectively, that are owned/operated by Ogudo's husband.

141.    Texas Secretary of State records reflect that GMS Health, LLC, was established on March 30, 2020, by Ogudo's husband as the only officer/director and had a tax forfeiture date of June 24, 2022, after Ogudo's husband failed to file the required reports.

142.    Texas Secretary of State records reflect that J & N Tender Care, Inc., was established on September 20, 2018. Ogudo was the initial Registered Agent and only Officer/Director. In April 2020, Ogudo's husband replaced Ogudo as the Registered Agent and sole Officer/Director of J & N Tender Care, Inc.

143.     Texas Workforce Commission (TWC) records do not reflect any employees' wages paid by GMS Health, LLC, or for J & N Tender Care, Inc.  In addition, TWC records do not reflect any wages paid to Ogudo's husband. The investigation could not locate evidence that these business entities provided legitimate services to UPHC.

144.     The investigation determined that UPHC was utilizing a legitimate home health care software company known as to which there were payments of $189,827.95 from September 2, 2020, through September 2, 2023.  That software company advertises that their software solution expedites the claims process for managed care and Medicare patients to shorten and improve a company's home health billing revenue cycle.  However, during basically the same time period, from May 14, 2020, through July 6, 2023, UPHC PRIMARY sent payments of $2,017,662.36 to another billing service.  In addition, JPMC UPHC 9211 sent payments totaling $356,577.86 to the second billing service; CADENCE UPHC previously sent payments totaling $121,187.29 to the second billing service.  In all the payments to the second billing service have totaled almost $2.5 million.

145.     Payments to outside vendors/service providers (which excludes transfers between the accounts or other related Ogudo accounts), were likely necessary to conduct operations of the business entities engaged in the underlying fraud scheme.  As these payments were funded primarily by fraud proceeds, these transactions constitute promotional money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

146.     A review of credits and debits to/from UPHC PRIMARY that were greater than $10,000.00 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo accounts included the following:

| UPHC PRIMARY | | | | | |
|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| UPHC SECONDARY | $1,275,500.00 | 26 | UPHC SECONDARY | $573,680.00 | 6 |
| JPMC UPHC 9211 | $14,883,406.00 | 65 | JPMC UPHC 9211 | $21,574,812.96 | 44 |
| JPMC UPHC 1769 | $2,423,751.22 | 38 | JPMC UPHC 1769 | $2,517,000.00 | 11 |
| Grand Total | $18,582,657.22 | 129 | MIDFIRST UPHC 0412 | $100,000.00 | 1 |
| | | | MIDFIRST UPHC 0390 | $500,000.00 | 2 |
| | | | MIDFIRST SANGO REAL | $300,000.00 | 1 |
| | | | JPMC DERA 0292 | $70,000.00 | 1 |
| | | | JPMC DERA 2922 | $3,388,950.00 | 70 |
| | | | MIDFIRST DERA 0180 | $100,000.00 | 1 |
| | | | MIDFIRST DERA 0172 | $100,000.00 | 1 |
| | | | Grand Total | $29,224,442.96 | 138 |

147.     Although it is unlikely that each of these transactions constitutes a criminal violation, the sheer volume of transactions, coupled with the overwhelmingly fraudulent source of funds indicates that this account was involved in numerous discrete violations of Title 18, United States Code, Section 1957, as incoming and outgoing transactions involving greater than $10,000.00 in fraud proceeds occurred repeatedly.

148.     This analysis holds true for the remaining accounts for which the same transaction analysis was undertaken.  Given the overwhelming composition of total funds identified as fraud proceeds, a substantial majority of the transactions in excess of $10,000.00 between any accounts are likely in violation of Title 18, United States Code, Section 1957.

149.     In short, the financial investigation determined that approximately 71% of the initial deposits into UPHC PRIMARY and an additional approximately 25% of deposits, consisting of recycled/laundered fraud proceeds, returning to UPHC PRIMARY, which were mostly funded originally from UPHC PRIMARY, were determined to be comprised primarily of fraudulent proceeds and therefore are forfeitable under Title 18, United States Code, Sections  981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461, as property "that constitutes or is derived . . . from proceeds traceable to the commission of the offense[s]" of wire fraud and health care fraud.  Furthermore, as fraud proceeds were

transferred both out of and back into the UPHC PRIMARY account from other accounts, in numerous violations of Title 18, United States Code, Sections 1956 and 1957, all funds on deposit in UPHC PRIMARY are forfeitable under Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1) as property "involved in" or traceable to property "involved in" those money laundering offenses.

### 4. *JPMC Savings Account #******9211 (JPMC UPHC 9211)*

150.     JP Morgan Chase records reflect that Chase Business Premier Savings Account #******9211 ("JPMC UPHC 9211") titled to United Palliative & Hospice Care Inc., 1811 First Oaks St., Ste. 120, Richmond, TX, 77406, was opened on or about March 31, 2020. "Ogudo – President" was the only signor on the account and appears to have signed (electronically) the signature card on March 31, 2020.

151.     On or about March 31, 2020, JPMC UPHC 9211 had a beginning balance of $0.00. From on or about March 31, 2020, to on or about September 8, 2023, JPMC UPHC 9211 received total credits of approximately $25,776,366.73, which included credits of $21,593,812.96 (84%) from UPHC PRIMARY, $3,800,148.21 (15%) from UPHC SECONDARY, $232,000.00 (1%) from JPMC Ogudo 0292 (an Ogudo personal account) and $105,000.00 from JPMC UPHC 1769.  The other credits totaled $45,405.56 and included a $40,000.00 ATM deposit from Ario Global Developers, and $4,000.00 in cash deposits. The remaining credits totaled $1,405.56 and consisted mainly of retail/shopping credits and bank fees, interest, or service charges.

152.     The credits from UPHC PRIMARY and UPHC SECONDARY which totaled $25,393,961.17 represented approximately 99% of the total deposits to JPMC UPHC 9211 during the above referenced time period.  Although JPMC UPHC 9211 did not receive fraud

funds directly from Medicare or Medicaid, JPMC UPHC 9211 was almost entirely funded from UPHC PRIMARY, which was determined to have been funded with approximately 96% fraud funds, and UPHC SECONDARY, which was determined to have been funded with approximately 95% fraud funds.

153.    A review of JPMC UPHC 9211 revealed that the account received a total of $21,593,812.96 in transfers from UPHC PRIMARY from June 3, 2020, through August 17, 2023, and JPMC UPHC 9211 returned a total of $14,960,906.00 to UPHC PRIMARY between April 23, 2020, through September 8, 2023.  JPMC UPHC 9211 received a total of $3,800,148.21 in transfers from UPHC SECONDARY from April 1, 2020, through September 1, 2023, and JPMC UPHC 9211 transferred back a total of $8,760,000.00 to UPHC SECONDARY between November 5, 2021, through January 20, 2023.

154.    Additional debits from JPMC UPHC 9211 included $365,000.00 to Challenge (Challenge Multi-Family Construction) and $356,577.86 to a secondary billing service.

155.    An analysis of JPMC UPHC 9211 determined that approximately 99% of credits were derived from UPHC PRIMARY and UPHC SECONDARY as well as other Ogudo Accounts that were primarily funded with fraud proceeds.  In effect, JPMC UPHC 9211 was utilized to receive funds from UHC PRIMARY and UPHC SECONDARY and to transfer a large portion of the funds back to those respective accounts.

156.    As of October 11, 2023, JPMC UPHC 9211 had an account balance of $1,908,922.37.

157.    A review of credits and debits to/from JPMC UPHC 9211 that were greater than $10,000.00 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| JPMC UPHC 9211 | | | | | |
|---|---|---|---|---|---|
| **Account** | **Sum of Credits** | **PMT Count** | **Account** | **Sum of Debits** | **PMT Count** |
| UPHC PRIMARY | $21,574,812.96 | 44 | UPHC PRIMARY | $14,883,406.00 | 65 |
| UPHC SECONDARY | $3,795,348.21 | 26 | UPHC SECONDARY | $8,760,000.00 | 5 |
| JPMC DERA 0292 | $232,000.00 | 1 | **Grand Total** | **$23,643,406.00** | **70** |
| JPMC UPHC 1769 | $104,000.00 | 1 | | | |
| **Grand Total** | **$25,706,161.17** | **72** | | | |

### 5. JPMC Checking Account #******0473 (UPHC SECONDARY)

158.    JP Morgan Chase records reflect that Chase Performance Business Checking Account #******0473 ("UPHC SECONDARY") titled to United Palliative & Hospice Care Inc., 1811 First Oaks St., Ste. 120, Richmond, TX 77406, was opened on or about March 31, 2020.  "Ogudo – President" was the only signor on the account and appears to have signed (electronically) the signature card on March 31, 2020.

159.    On or about March 31, 2020, UPHC SECONDARY had a beginning balance of $0.00.  From on or about March 31, 2020, to on or about September 8, 2023, UPHC SECONDARY received credits totaling $15,341,567.48, which included credits of $8,760,000.00 (57%) from JPMC UPHC 9211, $4,701,102.37 (31%) from Health and Human Services (Medicaid), $699,953.00 (4%) from JPMC UPHC 1769, and $604,480.00 (4%) from UPHC PRIMARY.

160.    The other credits included $499,900.00 (3%) for an EIDL Loan from the Small Business Administration on June 22, 2021, and two deposits totaling $172,285.08(1%) labeled HHS Stimulus.  The remaining credits totaled $96,152.97 (1%).  The EIDL and HHS Stimulus funds were most likely also obtained as part of a fraudulent scheme; however, those funds are not being considered bad monies in calculating the fraud percentages since the amounts represent a relatively small percentage of the overall account activity and are incidental to the current fraud investigation.

161.        The credits from Medicaid and three other Ogudo accounts (JPMC UPHC 9211,

UPHC PRIMARY, and JPMC UPHC 1769), totaled $14,765,535.37 which represented

approximately 96% of the total credits to UPHC SECONDARY during the above

referenced time frame.   From June 2020 through September 2023, UPHC SECONDARY

was the UPHC account that received Medicaid deposits.

162.        The monthly reimbursements from Medicaid (Health Human Services) to UPHC

SECONDARY between June 2020 and December 2022, are reflected as follows:





163.        A review of UPHC SECONDARY revealed that the account received a total of

$8,760,000.00 in transfers from JPMC UPHC 9211 from November 5, 2021, through

January 20, 2023, and UPHC SECONDARY returned a total of $3,800,148.21 to JPMC

UPHC 9211 between April 1, 2020, through September 8, 2023.  UPHC SECONDARY

received a total of $604,480.00 in transfers from UPHC PRIMARY from May 21, 2020,

through December 28, 2021, and UPHC SECONDARY transferred a total of $1,397,100.00

to UPHC PRIMARY between June 18, 2020, through January 25, 2023.

164.     UPHC SECONDARY received a total of $699,953.00 in transfers from JPMC UPHC 1769 from August 3, 2020, through November 10, 2021, and UPHC SECONDARY transferred a total of $906,779.00 to JPMC UPHC 1769 between August 3, 2020, through August 2, 2022.  On August 3, 2020, UPHC SECONDARY made two transfers to JPMC UPHC SECONDARY in the following amounts, $334,779.00 and $330,000.00, and on the same day received two transfers back from JPMC UPHC 1769 in the amounts of $334,779.00 and $328,174.00.

165.     To reiterate, many of the fund transfers between accounts do not appear to serve an economic or business purpose, as is evident in the money movements from/to UPHC SECONDARY and JPMC UPHC 1769 (frequently on or around the same date) as detailed in the following list:

| DATE | ACCOUNT ACTIVITY | CREDIT | DEBIT |
|------|------------------|--------|-------|
| 8/3/2020 | UPHC SECONDARY TO JPMC UPHC1769 | | $ 334,779.00 |
| 8/3/2020 | UPHC SECONDARY TO JPMC UPHC1769 | | $ 330,000.00 |
| 8/3/2020 | JPMC UPHC 1769 TO UPHC SECONDARY | $328,174.00 | |
| 8/3/2020 | JPMC UPHC 1769 TO UPHC SECONDARY | $334,779.00 | |
| 3/15/2021 | UPHC SECONDARY TO JPMC UPHC1769 | | $ 100,000.00 |
| 11/10/2021 | UPHC SECONDARY TO JPMC UPHC1769 | | $ 37,000.00 |
| 11/10/2021 | JPMC UPHC 1769 TO UPHC SECONDARY | $37,000.00 | |
| 8/2/2022 | UPHC SECONDARY TO JPMC UPHC1769 | | $ 105,000.00 |
| TOTAL | | $699,953.00 | $906,779.00 |

166.     A review of the debits from UPHC SECONDARY revealed that UPHC SECONDARY issued three consecutively numbered checks totaling $3,000,000.00 that were deposited into MIDFIRST UPHC 0412 on November 28, 2022, and an additional check for $500,000.00 that was deposited in MIDFIRST 0412 on January 17, 2023.

167.     Additional deposits from UPHC SECONDARY included: $86,500.00 to JPMC Ogudo 2922, $68,069.28 to Challenge (construction), and $50,000.00 to Ario Global Developers.

168.        An analysis of UPHC SECONDARY determined that approximately 96% of the credits were from Medicaid (Health and Human Services), which were determined to be fraud proceeds, and other Ogudo Accounts that were primarily funded with fraud proceeds.

169.        As of October 11, 2023, UPHC SECONDARY had an account balance of $874.65.

170.        A review of credits and debits to/from UPHC SECONDARY that were greater than $10,000.00 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts and/or Medicaid (Health Human Services) included the following:

| UPHC SECONDARY | | | | | |
|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| JPMC UPHC 9211 | $8,760,000.00 | 5 | JPMC UPHC 9211 | $3,795,348.21 | 26 |
| JPMC UPHC 1769 | $699,953.00 | 3 | JPMC UPHC 1769 | $906,779.00 | 5 |
| UPHC PRIMARY | $573,680.00 | 6 | UPHC PRIMARY | $1,275,500.00 | 22 |
| Grand Total | $10,033,633.00 | 14 | MIDFIRST UPHC 0412 | $3,500,000.00 | 4 |
| | | | JPMC DERA 2922 | $66,000.00 | 2 |
| | | | Grand Total | $9,543,627.21 | 59 |

### 6. JPMC Savings Account #******1769 (JPMC UPHC 1769)

171.        JP Morgan Chase records reflect that Chase Business Premier Savings Account #******1769 ("JPMC UPHC 1769") titled to United Palliative & Hospice Care Inc., 1811 First Oaks St., Ste 120, Richmond, TX 77406, was opened on or about March 2, 2020. "Ogudo – President" was the only signor on the account and appears to have signed the signature card on March 2, 2020.

172.        On or about March 2, 2020, JPMC UPHC 1769 had a beginning balance of $0.00. From on or about March 2, 2020, through on or about August 31, 2022, JPMC UPHC 1769 received total credits of $3,440,020.15, which included $2,533,100.00 (74%) from UPHC PRIMARY, and $906,779.00 (26%) from UPHC SECONDARY.  The other credits totaled $141.15 which consisted primarily of interest credits.

173.     The credits from UPHC PRIMARY and UPHC SECONDARY totaled $3,439,879.00 which represented approximately 99% of the total credits to JPMC UPHC 1769 during the above referenced time frame.

174.     A review of JPMC UPHC 1769 revealed that JPMC UPHC 1769 received $2,533,100.00 in credits from UPHC PRIMARY between March 3, 2020, through April 27, 2021.  JPMC UPHC 1769 transferred back $2,552,882.77 to UPHC PRIMARY from June 3, 2020, through May 11, 2022.

175.     JPMC UPHC 1769 received $906,779.00 in transfers from UPHC SECONDARY between August 3, 2020, through August 2, 2022.  JPMC UPHC 1769 transferred back $699,953.00 to UPHC SECONDARY from August 3, 2020, through November 10, 2021.

176.     A review of the debits to JPMC UPHC 1769 revealed additional fund transfers totaling $105,000.00 to JPMC UPHC 9211.  In addition, there was a $9,000.00 cash withdrawal on February 21, 2021.

177.     There does not appear to have been much additional activity in JPMC UPHC 1769 after August 31, 2022, when the account had a balance of $66.11.  As of October 11, 2023, the account balance had not changed ($66.11).

178.     An analysis of JPMC UPHC 1769 determined that approximately 99% of credits were derived from UPHC PRIMARY and UPHC SECONDARY which were primarily funded with fraud proceeds as described above.

179.     The account activity in JPMC UPHC 1769 since the account was opened does not reflect active business transactions in furtherance of medical treatments/care or payments to vendors/employees.

180.    A review of credits and debits to/from JPMC UPHC 1769 that were greater than $10,000.00 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo accounts included the following:

| JPMC UPHC 1769 | | | | | |
|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| UPHC PRIMARY | $2,517,000.00 | 11 | UPHC PRIMARY | $2,423,751.22 | 38 |
| UPHC SECONDARY | $906,779.00 | 5 | UPHC SECONDARY | $699,953.00 | 3 |
| **Grand Total** | **$3,423,779.00** | **16** | JPMC UPHC 9211 | $104,000.00 | 1 |
| | | | **Grand Total** | **$3,227,704.22** | **42** |

### 7. *Midfirst Bank Business Premium Money Market Account #******0412 (MIDFIRST UPHC 0412)*

181.    Midfirst Business Advantage Checking Account #******0412 titled to United Palliative & Hospice Care Inc. ("MIDFIRST UPHC 0412") 1811 First Oaks St., Ste. 120, Richmond, TX 77406, was opened on or about October 26, 2022.  "Ogudo – President" is the only signor on the account.

182.    On or about October 26, 2022, MIDFIRST UPHC 0412 had a beginning balance of $0.00.  From on or about October 26, 2022, to on or about September 30, 2023, MIDFIRST UPHC 0412 reflected total credits of $9,836,727.51, however, $3,100,000.00 of the credits consisted of re-deposit chargebacks from UPHC SECONDARY ($3,000,000.00) and UPHC PRIMARY ($100,000.00).  Therefore, the credits to MIDFIRST UPHC 0412 during the time period totaled $6,736,727.51, of which $6,500,000.00 (97%) was from UPHC SECONDARY, and $100,000.00 (1%) was from UPHC PRIMARY.   The other credits totaled $136,727.51 (2%) and consisted primarily of interest credits ($136,711.24).

183.    The credits to MIDFIRST UPHC 0412 from UPHC SECONDARY and UPHC PRIMARY totaled $6,600,000.00 which represented approximately 98% of the total credits to MIDFIRST UPHC 0412 during the above referenced time frame.

184.     A review of MIDFIRST UPHC 0412 revealed that there were three check credits for $1,000,000.00 each totaling $3,000,000.00 that were deposited and charged off the same day (November 15, 2022) from UPHC SECONDARY, and a $100,000.00 check credit on October 20, 2022, from UPHC PRIMARY that was charged off the same day.

185.     The Midfirst Bank statements for MIDFIRST UPHC 0412 reflected the following credit activity from UPHC SECONDARY and UPHC PRIMARY, excluding the charged off amounts:

| TRANSACTION DATE | CHECK # | PAYOR ACCOUNT | PAYEE ACCOUNT | AMOUNT |
|---|---|---|---|---|
| 10/20/2022 | 1758 | UPHC PRIMARY | MIDFIRST UPHC 0412 | $100,000.00 |
| 11/15/2022 | 1154 | UPHC SECONDARY | MIDFIRST UPHC 0412 | $1,000,000.00 |
| 11/15/2022 | 1155 | UPHC SECONDARY | MIDFIRST UPHC 0412 | $1,000,000.00 |
| 11/15/2022 | 1156 | UPHC SECONDARY | MIDFIRST UPHC 0412 | $1,000,000.00 |
| 11/23/2022 | 1043 | UPHC SECONDARY | MIDFIRST UPHC 0412 | $1,000,000.00 |
| 11/23/2022 | 1044 | UPHC SECONDARY | MIDFIRST UPHC 0412 | $1,000,000.00 |
| 11/23/2022 | 1045 | UPHC SECONDARY | MIDFIRST UPHC 0412 | $1,000,000.00 |
| 1/16/2023 | 1166 | UPHC SECONDARY | MIDFIRST UPHC 0412 | $500,000.00 |
| **TOTAL** | | | | **$6,600,000.00** |

186.     A tracing of the funds that comprised the $6,600,000.00 that was sent from UPHC SECONDARY to MIDFIRST UPHC 0412 revealed that the monies originated in JPMC UPHC 9211, which was approximately 99% funded from UPHC PRIMARY and UPHC SECONDARY.

187.     The debits from MIDFIRST UPHC 0412 included a payment of $1,759,917.67 to Charter Title Company for the purchase of a commercial property in Cypress, TX, in the name of Sango Realty Associates, LLC, that was not part of the UPHC business.   In addition, there was a $200,000.00 transfer from MIDFIRST UPHC 0412 to MIDFIRST UPHC 0390.

188.     As of September 30, 2023, MIDFIRST UPHC 0412 had an account balance of $4,774,410.83.

189.         An analysis of MIDFIRST UPHC 0412 determined that approximately 98% of the credits were from UPHC SECONDARY and UPHC PRIMARY which were primarily funded with fraud proceeds, as described above.

190.         The account activity in MIDFIRST UPHC 0412 since the account was opened does not reflect active business transactions in furtherance of medical treatments/care or payments to vendors/employees.

191.         A review of credits and debits to/from MIDFIRST UPHC 0412 that were greater than $10,000.00 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| MIDFIRST UPHC 0412 | | | | | |
|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| UPHC SECONDARY | $6,500,000.00 | 7 | MIDFIRST UPHC 0390 | $200,000.00 | 1 |
| UPHC PRIMARY | $100,000.00 | 1 | **Grand Total** | **$200,000.00** | **1** |
| **Grand Total** | **$6,600,000.00** | **8** | | | |

### 8. MIDFIRST Account #******0390 (MIDFIRST UPHC 0390)

192.         Midfirst Business Advantage Checking Account #******0390 titled to United Palliative & Hospice Care Inc. ("MIDFIRST UPHC 0390"), 1811 First Oaks St., Ste. 120, Richmond, TX, 77406, was opened on or about October 26, 2022.  "Ogudo – President" is the only signor on the account.

193.         On or about October 26, 2022, MIDFIRST UPHC 0390 had a beginning balance of $0.00.  From on or about October 26, 2022, to on or about September 28, 2023, MIDFIRST UPHC 0390 received credits totaling $690,367.60, excluding a charge off credit of $200,000.00.   The credits consisted of $490,000.00 (71%) from UPHC PRIMARY, $200,000.00 (29%) from MIDFIRST UPHC 0412, and a $367.60 rebate bonus.

194.     The credits to MIDFIRST UPHC 0390 from UPHC PRIMARY and MIDFIRST UPHC 0412 totaled $690,000.00 which represented approximately 99% of the total credits to MIDFIRST UPHC 0390 during the above referenced time frame.

195.     A review of the debits from MIDFIRST UPHC 0390 indicated payments totaling $578,701.43 to a credit card ending in 0519 which charged payments for the construction of Ogudo's residences.

196.     An analysis of MIDFIRST UPHC 0390 determined that approximately 99% of the credits were from UPHC PRIMARY and MIDFIRST UPHC 0412, which were primarily funded with fraud proceeds traceable to UPHC PRIMARY and UPHC SECONDARY.

197.     As of September 30, 2023, MIDFIRST UPHC 0390 had an account balance of $111,649.17.

198.     The account activity in MIDFIRST UPHC 0390 since the account was opened does not reflect active business transactions in furtherance of medical treatments/care or payments to vendors/employees.

199.     A review of credits and debits to/from MIDFIRST UPHC 0390 that were greater than $10,000.00 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| MIDFIRST UPHC 0390 | | | | | | |
|---|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | | Account | Sum of Debits | PMT Count |
| UPHC PRIMARY | $390,000.00 | 2 | | MIDFIRST CD 1519 | $576,338.75 | 6 |
| MIDFIRST UPHC 0412 | $200,000.00 | 1 | | | | |
| Grand Total | $590,000.00 | 3 | | Grand Total | $576,338.75 | 6 |

### *9. MIDFIRST Account #******0420 (MIDFIRST UPHC 0420)*

200.        Midfirst Business Advantage Checking Account #******0420 titled to United Palliative & Hospice Care Inc. ("MIDFIRST UPHC 0420"), 1811 First Oaks St., Ste.120, Richmond, TX, 77406, was opened on or about October 26, 2022.  "Ogudo – President" is the only signor on the account.

201.        On or about October 26, 2022, MIDFIRST UPHC 0420 had a beginning balance of $0.00.  From on or about October 20, 2022, to on or about September 30, 2023, the credits to MIDFIRST UPHC 0420 totaled $10,000.00 and consisted of a $10,000.00 check deposit on October 20, 2022, from UPHC PRIMARY.  The $10,000.00 deposit consisted of a $200,000.00 check dated October 20, 2022, from UPHC PRIMARY less $190,000.00 that was credited to MIDFIRST UPHC 0390.  Midfirst Bank records do not reflect any additional activity in MIDFIRST UPHC 0420 through September 30, 2023.

202.        An analysis of MIDFIRST Ogudo 0420 revealed that the account was entirely funded (100%) from UPHC PRIMARY which was primarily funded with fraud proceeds.

203.        As of September 30, 2023, MIDFIRST UPHC 0420 had an account balance of $10,000.00.

204.        The account activity in MIDFIRST UPHC 0420 since the account was opened does not reflect active business transactions in furtherance of medical treatments/care or payments to vendors/employees.

### *10. MIDFIRST Account #******0900 (MIDFIRST SANGO REALTY)*

205.        Midfirst Business Advantage Checking Account #******0900 titled to Sango Realty Associates, L.L.C. ("MIDFIRST SANGO REALTY"), 1811 1st Oaks St., Ste. 120,

Richmond, TX, 77406, was opened on or about March 17, 2023.  "Ogudo – Managing Member" is the only signor on the account.

206.     On or about March 17, 2023, MIDFIRST SANGO REALTY had a beginning balance of $0.00.  From on or about March 17, 2023, to on or about August 28, 2023 the credits to MIDFIRST SANGO REALTY totaled $300,000.00 and consisted of a $300,000.00 check deposit on or about April, 5, 2023, from UPHC PRIMARY, RE: Investment.

207.     An analysis of MIDFIRST SANGO REALTY revealed that the account was entirely funded (100%) with funds from UPHC PRIMARY, which was primarily funded with fraud proceeds.

208.     The debits from MIDFIRST SANGO REALTY included $40,342.94 in loan payments.

209.     Texas Secretary of State records reflect that Sango Realty Associates, L.L.C., 1811 First Oaks St., Ste. 120, Richmond, TX, 77406, was established July 8, 2022.  The only officer/director is "Dera Ogudo – Manager", 1811 First Oaks St., Ste. 120, Richmond, TX, 77406.

210.     As indicated above, in July 2023, Ogudo purchased a commercial property in Cypress, TX, in the name of Sango Realty Associates, L.L.C., with more than $1.7 Million in funds from issued from MIDFIRST UPHC 0412.  These funds were primarily fraud funds generated by UPHC, but the commercial real property was purchased in the name of Sango Realty Associates, L.L.C.

211.     As of August 28, 2023, the balance in MIDFIRST SANGO REALTY was $257,407.06.

212.     A review of credits to/from MIDFIRST SANGO REALTY that were greater than $10,000 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| MIDFIRST SANGO REALTY 0900 | | | | | | |
|---|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| UPHC PRIMARY | $300,000.00 | 1 | | | |
| Grand Total | $300,000.00 | 1 | Grand Total | $0.00 | 0 |

### 11. MIDFIRST Account #******5799 (MIDFIRST SANGO REALTY RENTS)

213.     Midfirst Business Advantage Checking Account #******5799 titled to Sango Realty Associates, L.L.C. ("MIDFIRST SANGO REALTY RENTS"), 1811 1st Oaks St., Ste. 120, Richmond, TX, 77406, was opened on or about August 2, 2023. "Ogudo" is the only signor on the account.

214.     On or about August 2, 2023, MIDFIRST SANGO REALTY RENTS had a beginning balance of $0.00. From on or about August 2, 2023, to on or about September 22, 2023, the credits to MIDFIRST SANGO REALTY RENTS totaled $54,927.48, which consisted primarily of rent payments from various business entities, along with a $2,250.00 transfer from MIDFIRST SANGO REALTY.

215.     The rental payments in MIDFIRST SANGO REALTY RENTS appear to be associated with the commercial property at 21350 FM 529 Rd., Cypress, TX, that Ogudo purchased in July 2023. The contract sale price was $4,850,000.00. Ogudo paid $45,000.00 in earnest money from UPHC PRIMARY and $1,759,917.67 from MIDFIRST UPHC 0412 in July 2023 to purchase of the commercial property. The commercial property is not known to be affiliated with UPHC. Because the real property was purchased with fraud proceeds traceable to the fraudulent scheme, the funds credited to MIDFIRST SANGO

REALTY RENTS are the direct result of the illegal scheme and represent proceeds derived from fraud funds (and property "involved in" money laundering) as well.

## OGUDO PERSONAL ACCOUNTS

### *1. JPMC Savings Account #******0292 (JPMC Ogudo 0292)*

216.     JPMC records reflect that savings account #******0292 titled to Dera I. Ogudo ("JPMC Ogudo 0292") was opened on or about May 31, 2018.  Ogudo was the only signor on the account and appears to have signed the electronic signature card on May 31, 2018.

217.     On or about January 1, 2020, JPMC Ogudo 0292 had a beginning balance of $.45 cents.  From on or about January 1, 2020, through on or about September 11, 2023, JPMC Ogudo 0292 received credits totaling $3,760,965.05, of which $2,759,393.48 (73%) was from ADP labeled "United Palliative Direct Dep" ID#'s 9444444404 and 9111111101, $615,600.00 (16%) was from JPMC Ogudo 2922, $220,000.00 (6%) was from CADENCE UPHC 4630, $70,000.00 (2%) was from UPHC PRIMARY, and $44,000.00 (1%) was from JPMC Ogudo 6187.  In addition, there were credits of $25,000.00 (.7%) from GMS Health LLC, and $21,000.00 (.6%) from T & N Tender Care.  The other credits totaled $5,971.57 (.2%).

218.     The credits to JPMC Ogudo 0292 totaled $3,754,993.48 from ADP and other accounts which represented approximately 98% of the total credits to JPMC Ogudo 0292 during the above referenced time frame.

219.     A review of JPMC Ogudo 0292 revealed that JPMC Ogudo 0292 received $615,600.00 from JPMC Ogudo 2922 between January 31, 2020, through August 25, 2022. JPMC Ogudo 0292 transferred $1,386,290.00 to JPMC Ogudo 2922 from February 3, 2020, through September 11, 2023.

220.     An analysis of JPMC Ogudo 0292 revealed that approximately 98% of the credits were derived from UPHC PRIMARY and other accounts which were primarily funded with fraud proceeds.  Despite the characterization as payroll, these deposits from ADP and the other accounts were funded almost entirely with fraud proceeds generated by UPHC and laundered through the various accounts.

221.     As of October 11, 2023, JPMC Ogudo 0292 had an account balance of $5,492,226.77.  JP Morgan Chase records reflect that on or about October 12, 2023, there was a check withdrawal for $5,000,000.00 from JPMC Ogudo 0292.

222.     A review of credits and debits to/from JPMC 0292 that were greater than $10,000.00 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| JPMC DERA 0292 | | | | | |
|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| United Palliative Direct | $2,684,115.71 | 74 | JPMC DERA 2922 | $ 994,100.00 | 23 |
| JPMC DERA 2922 | $578,000.00 | 13 | JPMC UPHC 6187 | $ 63,000.00 | 1 |
| Cadence UPHC 4630 | $220,000.00 | 3 | JPMC UPHC 9211 | $ 232,000.00 | 1 |
| UPHC Primary | $70,000.00 | 1 | **Grand Total** | **$1,289,100.00** | • **25** |
| JPMC UPHC 6187 | $44,000.00 | 1 | | | |
| **Grand Total** | **$3,596,115.71** | **92** | | | |

### 2. JPMC Account #*****2922 (JPMC Ogudo 2922)

223.     JPMC checking account #*****2922 titled to Dera I. Ogudo ("JPMC Ogudo 2922") was opened on or about February 3, 2011.  Ogudo was the original signor on the account and appears to have signed the signature card on February 3, 2011.

224.     On or about February 1, 2020, JPMC Ogudo 2922 had a beginning balance of $2,637.85   From on or about February 1, 2020, to on or about September 9, 2023, JPMC Ogudo 2922 received credits totaling $5,263,053.86 of which $3,509,669.00 (67%) was from UPHC PRIMARY, $1,386,290.00 (26%%) was from JPMC Ogudo 0292, $86,500.00

(2%) from UPHC SECONDARY, $26,280.00 (.5%) was from JPMC Ogudo 6187, $10,000.00 was from CADENCE UPHC 4630. There were also two ADP deposits totaling $4,500.93.

225.     The other credits totaled $239,273.93 (5%) and included $41,810.00 from Ogudo's husband), $25,250.00 from J & N Tender Care, Inc., $2,000.00 from GMS Health, LLC, $20,750.00 from a UPHC affiliated business, $28,500.00 from another UPHC affiliated business, and a $20,000.00 cash deposit. The remaining credits totaled $100,963.93 and consisted primarily of refund credits and credits from individuals.

226.     The credits to JPMC Ogudo 2922 totaled $5,023,779.93 from UPHC PRIMARY, UPHC SECONDARY, other Ogudo Accounts, and ADP, which represented approximately 95% of the total credits to JPMC Ogudo 2922 during the above referenced time frame.

227.     The credits to JPMC Ogudo 2922 totaled $3,509,669.00 from UPHC PRIMARY which included the following: $1,229,000.00 in transfer credits, $801,669.00 labeled "United Palliative Payroll" and subsequently "Online Realtime Payroll Payment," $845,000.00 in check credits, $609,300.00 labeled "Uphc transportation", and $24,700.00 in Zelle payments.

228.     Beginning on January 24, 2022, through March 28, 2023, the transfers from UPHC PRIMARY to JPMC Ogudo 2922 were categorized as "Uphc transportation" despite the fact that the payments were sent to Ogudo's personal account (JPMC Ogudo 2922).

229.     The funds sent from UPHC SECONDARY to JPMC Ogudo 2922 included two credits totaling $25,000.00 labeled "Online Realtime Payroll Payment" on November 22, 2021.

230.        JPMC Ogudo 2922 received $1,386,290.00 from JPMC Ogudo 0292 between February 1, 2020, through September 9, 2023, and transferred back $614,600.00 from April 10, 2020, through August 25, 2022.

231.        The debits from JPMC Ogudo 2922 included $620,841.39 in payments to Ario Global Developers between July 25, 2019, through July 17, 2023.  Note: $545,841.39 was paid between July 2020 through December 21, 2021.  In addition, there was an additional $57,000.00 paid to Ogudo's ex-husband in seven payments from March 12, 2021, through July 27, 2022.  As discussed, Ario Global Developers was utilized by Ogudo's ex-husband Ogudo's ex-husband to receive and distribute the funds used for the construction of two luxury residences on behalf of Ogudo.

232.        An analysis of JPMC Ogudo 2922 revealed that approximately 95% of the credits were from UPHC PRIMARY, UPHC SECONDARY, and other Ogudo Accounts which were primarily funded with fraud proceeds.

233.        As of October 11, 2023, JPMC Ogudo 2922 had an account balance of $3,054.08.

234.        A review of credits and debits to/from JPMC Ogudo 2922 that were greater than $10,000 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| JPMC DERA 2922 | | | | | |
|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| UPHC PRIMARY | $3,388,950.00 | 70 | JPMC DERA 0292 | $ 578,000.00 | 13 |
| JPMC DERA 0292 | $994,100.00 | 22 | | | |
| UPHC Secondary | $66,000.00 | 2 | | | |
| Grand Total | $4,449,050.00 | 94 | | | |
| | | | Grand Total | $578,000.00 | 13 |

### 3. JPMC Account #*****6187 (JPMC Ogudo 6187)

235.     JPMC records reflect that checking account #*****6187 ("JPMC Ogudo 6187") titled to Dera I. Ogudo was opened on or about December 23, 2013.  Ogudo is the only signor on the account and appears to have signed the signature card on December 23, 2013.

236.     On or about January 1, 2020, JPMC Ogudo 6187 had a beginning balance of $506.98.  From on or about January 1, 2020, to on or about April 27, 2023, JPMC Ogudo 6187 received total credits of $75,390.00, of which $72,600.00 (96%) was from JPMC Ogudo 0292.  The other credits totaled $2,790.00 (4%) and included a cash deposit of $1,490.00.

237.     From May 17, 2022, through on or about April 27, 2023, the only activity in JPMC Ogudo 6187 consisted of a $4,000.00 credit on February 2, 2023, from JPMC Ogudo 0292 followed by two Zelle payments on the same day for $2,000.00 each to family members, and a $5,000.00 credit on April 27, 2023, from JPMC Ogudo 0292 followed by a $5,000.00 transfer the same day to JPMC Ogudo 2922.

238.     An analysis of JPMC Ogudo 6187 revealed that approximately 96% of the credits were from JPMC Ogudo 0292, which was primarily funded with fraud proceeds.

239.     As of October 11, 2023, JPMC Ogudo 6187 had an account balance of $2.20.

240.     A review of credits and debits to/from JPMC Ogudo 6187 that were greater than $10,000 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| JPMC DERA 6187 | | | | | | |
|---|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| JPMC DERA 0292 | $63,000.00 | 1 | JPMC DERA 0292 | $44,000.00 | 1 |
| Grand Total | $63,000.00 | 1 | Grand Total | $44,000.00 | 1 |

### 4. *Midfirst Bank Account #\*\*\*\*\*\*0172 (MIDFIRST Ogudo 0172)*

241.      Midfirst Bank Preferred Money Market Account #\*\*\*\*\*\*0172 ("MIDFIRST Ogudo 0172") titled to Ogudo, 11023 Avery Oaks Ln., Richmond, TX, 77405, was opened on or about January 27, 2023.  "Ogudo – Sole Owner" is the only signor on the account.

242.      On or about January 27, 2023, MIDFIRST Ogudo 0172 had a beginning balance of $0.00.  From on or about January 27, 2023, through September 30, 2023, MIDFIRST Ogudo 0172 received credits totaling $102,091.07, which consisted of a $100,000.00 (98%) initial check deposit on January 30, 2023, from UPHC PRIMARY, and interest credits of $2,091.07 (2%).   There was no further activity in MIDFIRST Ogudo 0172 through September 30, 2023.

243.      An analysis of MIDFIRST Ogudo 0172 revealed that the account was entirely funded (100%) from UPHC PRIMARY which was primarily funded with fraud proceeds. The additional deposits to MIDFIRST Ogudo 0172 consisted of interest credits.

244.      On or about October 12, 2023, Ogudo deposited $5,000,000.00 into MIDFIRST Ogudo 0172 via a check issued from JPMC Ogudo 0292.

245.      As of October 27, 2023, MIDFIRST Ogudo 0172 had a balance of $5,202,728.88.

246.      A review of credits and debits to/from MIDFIRST Ogudo 0172 that were greater than $10,000.00 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| Account MIDFIRST DERA 0172 | | | | | |
|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | Account | Sum of Debits | PMT Count |
| UPHC PRIMARY | $100,000.00 | 1 | | | |
| JPMC DERA 0292 | $5,000,000.00 | 1 | | | |
| **Grand Total** | **$5,100,000.00** | **2** | **Grand Total** | **$0.00** | **0** |

### 5. *MIDFIRST Account #******0180 (MIDFIRST Ogudo 0180)*

247.      Midfirst Preferred Checking Account #******0180 titled to Ogudo ("MIDFIRST Ogudo 0180"), 11023 Avery Oaks Ln., Richmond, TX, 77405, was opened on or about January 27, 2023.  "Ogudo – Sole Owner" is the only signor on the account.

248.      On or about January 27, 2023, MIDFIRST Ogudo 0180 had a beginning balance of $0.00.  From January 27, 2023, through September 17, 2023, MIDFIRST Ogudo 0180 received credits totaling $100,563.72, which consisted of a $100,000.00 (99%) initial check deposit on January 27, 2023, from UPHC PRIMARY, and interest credits of $563.72 (1%).  There was no further activity in MIDFIRST Ogudo 0180 through September 17, 2023.

249.      An analysis of MIDFIRST Ogudo 0180 revealed that the account was entirely funded (100%) from UPHC PRIMARY which was primarily funded with fraud proceeds.  The additional deposits to MIDFIRST Ogudo 0180 consisted of interest credits.

250.      As of September 17, 2023, MIDFIRST Ogudo 0180 had a balance of $100,563.72.

251.      A review of credits to/from MIDFIRST Ogudo 0180 that were greater than $10,000 (and therefore likely to constitute violations of Title 18, United States Code, Section 1957) to/from other Ogudo Accounts included the following:

| Account MIDFIRST DERA 0180 | | | Account | Sum of Debits | PMT Count |
|---|---|---|---|---|---|
| Account | Sum of Credits | PMT Count | | | |
| UPHC PRIMARY | $100,000.00 | 1 | | | |
| Grand Total | $100,000.00 | 1 | Grand Total | $0.00 | 0 |

## CONSTRUCTION OF RESIDENCES
## AND PURCHASE OF COMMERCIAL PROPERTY

252.      As part of utilizing a web of related business and personal accounts to launder fraud proceeds, Ogudo also utilized the accounts to purchase a tract of commercial real property along with a parcel of real property (intended for residential construction).  Ogudo used

fraud proceeds to construct residences on the residential real property she purchased and on a second piece of real property that she had previously purchased.

253.     Purchases of the commercial property and the residential property along with the construction projects were funded primarily with fraud proceeds, which constitutes violations of Title 18, United States Code, Sections 1956 and 1957, rendering the real properties subject to forfeiture.

**6418 Anthonia Lane, Richmond, TX**

254.     On or about December 13, 2017, Celebrate Learning Academy, LLC, a Texas Limited Liability Company, purchased the real property at 6418 Anthonia Ln., Richmond, TX.  The contract sale price was $189,000.00.  Ogudo signed the Settlement Statement on behalf of on behalf of Celebrate Learning Academy, LLC.  At the time of purchase, the property was paid for in full: with a check, two wire transfers, and two Cashier's Checks.

255.     While not known for certain, the funds used to purchase the real property appear to have come from Ogudo accounts at JP Morgan Chase Bank and Bank of America titled to Celebrate Learning Academy, LLC.

256.     On June 4, 2018, the real property was transferred from Celebrate Learning Academy LLC to Ogudo.  Ogudo signed the General Warranty Deed as Managing Director of Celebrate Learning Academy, LLC, and Ogudo's ex-husband signed as Manager of Celebrate Learning Academy, LLC.  The investigation determined that the property was not used to construct a "learning academy".

257.     Instead, in approximately October 2019, Ogudo's ex-husband presented himself as the general contractor under the business name of Ario Global Developers and entered into

a contract with Juan Romero/Romero Concrete/RCI to construct a 10,549 sq. ft. luxury personal residence on the real property at 6418 Anthonia Ln., Richmond, TX.  As indicated, Ogudo was the sole titled owner of the real property since June 2018.

258.     Ogudo's ex-husband subsequently hired another company, Challenge Multifamily Construction, Inc./Javier Garza to complete the construction of the home and subsequently to build a second luxury residence at 4524 Avenida Monterrey, Richmond, TX, 77046.

259.     Information received from Challenge Multifamily Construction, Inc., reflected that on or about October 4, 2021, Challenge Multifamily Construction, Inc., began construction at the Anthonia Ln. address.   The investigation revealed that Challenge Multifamily Construction, Inc. was the sub-contractor for Ario Global Developers and that Challenge Multifamily Construction, Inc. was actually the builder of both residences.

260.     Ft. Bend County Appraisal District records reflect that Ogudo is the owner of the real property at 6418 Anthonia Ln., Richmond, TX, and listed the year built as 2020 for the residence.  According to the Ft. Bend County Appraisal District, the 2023 market value was $2,925,415.00.

261.     The following is a photograph of the residence at 6418 Anthonia Ln., Richmond, TX:



**4525 Avenida Monterrey, Richmond, TX**

262.     On or about March 4, 2021, Ogudo purchased the real property at 4524 Avenida Monterrey, Richmond, TX. The contract sale price was $191,500.00. Ogudo paid for the property with a JP Morgan Chase Bank Cashier's Check dated March 4, 2021, for $192,682.46 payable to Select Title issued from JPMC Ogudo 2922. Ogudo had previously paid $1,915.00 in earnest money for the property purchase with a JP Morgan Chase Bank Cashier's Check dated February 22, 2021, payable to Select Title issued from JPMC Ogudo 2922.

263.     Ft. Bend County Appraisal District records reflect that Ogudo is the owner of the real property at 4524 Avenida Monterrey, Richmond, TX, and listed the year built as 2022 for the residence. According to the Ft. Bend County Appraisal District, the 2023 tax appraised value was $1,156,202.00.

264.     The following is a photograph of the residence at 4524 Avenida Monterrey, Richmond, TX:



265.     Information received from Challenge Multifamily Construction, Inc., reflected that on or about May 25, 2022, Challenge Multifamily Construction, Inc., entered a contract to build an approximately 9,000 sq. ft. luxury residence for Ogudo at 4524 Avenida Monterrey, Richmond, TX, 77046.

266.     A review of accounts for payments to Ario Global Developers, Romero Concrete, Challenge Multifamily Construction, Inc., etc., for the costs of construction of the residences at 6418 Anthonia Ln, Richmond, TX and 4524 Avenida Monterrey, Richmond, TX, reflected payments totaling more than $6.7 Million from June 2019, through September, 2023.  Note: the residence at 4524 Avenida Monterrey, Richmond, TX, was reportedly not totally completed as of mid-2023.

267.     The vast majority of the funds used to build these luxury residences originated in UPHC PRIMARY and CADENCE UPHC 4630 which were determined to consist primarily of fraud proceeds.

**21350 FM 529 Road, Cypress, TX**

268.     On or about July 26, 2023? Ogudo, using the business name of Sango Realty Associates, LLC, a Texas limited liability company, purchased a commercial property at 21350 FM 529 Rd., Cypress, TX.  The contract sale price was $4,850,000.00.  Ogudo paid the earnest money with a check (#1871) dated May 22, 2023, for $45,000.00 payable to Charter Title from UPHC PRIMARY and sent a wire transfer on July 27, 2023, for $1,759,917.67 to Charter Title from MIDFIRST UPHC 0412 for the purchase of the commercial property.

269.     At the time of the purchase Ogudo obtained a $3,000,000.00 loan (5 yr.) from Midfirst Bank for the remaining funds owed at the closing.  Ogudo signed the Buyer's Settlement Statement for the purchase of the real property as owner of Sango Realty Associates, L.L.C.  Texas Secretary of State records reflect that Sango Realty Associates, L.L.C. has the same physical address as UPHC, 1811 First Oaks St., Ste. 120, Richmond, TX 77406.

270.     Ogudo is the sole signor on MIDFIRST UPHC 0412.  Midfirst Bank records reflect that the loan payments for August and September 2023 were paid from MIDFIRST SANGO REALTY, of which Ogudo is also the sole signor.  As of October 10, 2023, the loan balance was $2,991,966.94.

271.     A review of MIDFIRST UPHC 0412 revealed that approximately 97% of the funds in the account were from UPHC SECONDARY and an additional 1% were from UPHC PRIMARY, both accounts were determined to be primarily funded with fraud proceeds.

272.     In August 2023, Ogudo opened a second account at Midfirst Bank ending in 5799 titled to Sango Realty Associates L.L.C. ("SANGO REALTY RENTS") which Ogudo

appears to use to collect the rent payments from various businesses renting space from her at the commercial property at 21350 FM 529 Rd., Cypress, TX.  Again, the commercial property is not known to be affiliated with UPHC.

273.　　　The following is a photograph depicting the commercial property at 21350 FM 529 Rd., Cypress, TX:



## CONCLUSION

274.　　　For the reasons stated therein, all of the Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1) as "property, real or personal, involved in a transaction or attempted transaction in violation of sections 1956 and/or 1957 of this title, or any property traceable to such property." Additionally, each of the Defendant Properties are also subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461, as property "that constitutes or is derived . . . from proceeds traceable to the commission of the offense[s]" of wire fraud and health care fraud.

275.     Based on the investigation described above, UPHC and Ogudo's hospice service business operations were permeated by fraud which overwhelmed legitimate business operations. Therefore, the United States seeks forfeiture of the Defendant Properties.

## NOTICE TO ANY POTENTIAL CLAIMANT

YOU ARE HEREBY NOTIFIED if you assert an interest in the Defendant Properties subject to forfeiture and want to contest the forfeiture, you must file a verified claim which fulfills the requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  The verified claim must be filed no later than thirty-five (35) days from the date this complaint was sent to you in accordance with Rule G(4)(b); or, if this Complaint was not sent to you, no later than 60 days after the first day of publication of notice on an official internet government forfeiture site, in accordance with Rule G(5)(a)(ii)(B).

An answer or a motion under Federal Rule of Civil Procedure 12 must be filed no later than twenty-one (21) days after filing the claim.  The claim and answer must be filed with the United States District Clerk for the Southern District of Texas, either electronically or at the United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002. A copy must be served upon the undersigned Assistant United States Attorney either electronically or at the address provided in this Complaint.

<u>RELIEF REQUESTED</u>

The United States will serve notice, along with a copy of the Complaint, on the property owner and on any other persons who reasonably appear to be potential claimants. The United States seeks a final judgment forfeiting the Defendant Properties to the United States and any other relief to which the United States may be entitled.

Respectfully submitted,

ALAMDAR S. HAMDANI
United States Attorney
Southern District of Texas

By:        */s/ Brandon Fyffe*
Brandon Fyffe
SDTX Federal No. 3698129
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone (713) 567-9351
Brandon.Fyffe@usdoj.gov

## VERIFICATION

I, Ashley Tucker, a Special Agent employed by the Federal Bureau of Investigation, declare under the penalty of perjury, as provided by 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Civil Forfeiture In Rem and Notice to Potential Claimants, and that the facts stated therein are based upon my personal knowledge, upon information obtained from other law enforcement personnel, or upon information I obtained in the course of my investigation, and they are true and correct to the best of my knowledge and belief.

Executed on the 5th day of June, 2024.

_____
Ashley Tucker, Special Agent
Federal Bureau of Investigation